# District of Columbia Court of Appeals

No. 14-CV-434

MONTGOMERY BLAIR SIBLEY,

                Appellant,

v.

ST. ALBANS SCHOOL, *et al.*,

                Appellees.



MAR 24 2016

DISTRICT OF COLUMBIA COURT OF APPEALS

CAB-2202-10

On Appeal from the Superior Court of the District of Columbia
Civil Division

BEFORE:  FISHER and EASTERLY, *Associate Judges*; and RUIZ, *Senior Judge*.

## JUDGMENT

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel.  On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the judgment on appeal is affirmed.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated: March 24, 2016.

Opinion by Senior Judge Vanessa Ruiz.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-CV-434

FILED 3/24/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

MONTGOMERY BLAIR SIBLEY, APPELLANT,

v.

ST. ALBANS SCHOOL, *et al*., APPELLEES.

Appeal from the Superior Court of the
District of Columbia
(CAB-2202-10)

(Hon. Judith N. Macaluso, Trial Judge)

(Argued February 4, 2015                    Decided March 24, 2016)

Montgomery Blair Sibley, *pro se*.

*Laird Hart* for appellees.

Before FISHER and EASTERLY, *Associate Judges*, and RUIZ, *Senior Judge*.

RUIZ, *Senior Judge*: Appellant Montgomery Blair Sibley appeals from the trial court's grant of summary judgment dismissing his various claims against appellees St. Albans School, the Cathedral Church of St. Peter and St. Paul (the National Cathedral), and the Protestant Episcopal Cathedral Foundation (PECF), and granting appellees' counterclaim and request for attorney's fees. We conclude that there is no error that warrants reversal and affirm.

## I. Facts

The facts, as gleaned from the evidence presented by the parties for consideration on summary judgment are as follows. St. Albans School, a private, all-boys school, and the National Cathedral, both in the District of Columbia, operate under an umbrella corporation, PECF. In July 2007, appellant's then-10-year-old son, A.B.S., began to audition for the National Cathedral Choir of Men and Boys and he was offered a place as a Boy Chorister in 2008. One of the conditions of the offer was attendance at St. Albans School, and A.B.S.'s admission to the school was, in turn, contingent upon A.B.S.'s commitment to the chorister program through the eighth grade. Appellant was required to sign a letter accepting A.B.S.'s appointment to the choir "beginning in September 2008 until June 2013 or early voice change." A.B.S. joined the choir and enrolled at St. Albans School as a fifth-grader (Form B) for the 2008-09 school year. For his participation in the choir he received a stipend of $13,514, approximately forty-three percent of that year's school tuition. That year appellant's father signed the enrollment contract with St. Albans School and paid the remainder of A.B.S.'s tuition for the school year.[1]

---

[1] According to appellant, his father (A.B.S.'s grandfather), a St. Albans School alumnus who had been a choir boy at the National Cathedral, had encouraged A.B.S. to apply for the choir. He promised that if A.B.S. was accepted

(continued . . .)

In February of 2009, appellant signed a contract re-enrolling A.B.S. in sixth grade (Form A) for the 2009-10 school year. By signing the contract, appellant promised to pay A.B.S.'s tuition for the year, less his choral stipend (that year, $8,907, or twenty-seven percent of tuition) and financial aid (in the amount of $6,000), leaving a balance of $17,990, with the initial payment due July 3, 2009. On July 16, 2009, appellant notified St. Albans that he would need to secure A.B.S.'s tuition from the estate of his father, who had recently died. On January 25, 2010, Gregory A. Parker, St. Albans School's Director of Finance, sent a letter informing appellant that A.B.S. would be expelled and not permitted to reenroll for the following year if the outstanding tuition was not paid. On February 17, in a telephone conversation, appellant informed Parker that he would be able to pay $2,000 in the near future and would pay the rest of the tuition once his father's estate was settled, but that the matter was in litigation because his father's will had not explicitly provided for A.B.S.'s tuition payments. During a telephone conversation on February 24, Parker offered that A.B.S. could complete the school year if appellant paid $2,000, but that he would not be allowed to reenroll for the following school year. On March 2, appellant contested this decision with Vance Wilson, the Headmaster of St. Albans School. Wilson responded in writing on

_____
(. . . continued)

to the choir and St. Albans School, he would pay the balance of tuition after the chorister stipend and financial aid.

March 10, and again informed appellant that A.B.S. would be allowed to finish the year if the $2,000 payment was received before spring break but that he would not be permitted to return for the 2010-11 school year if the outstanding tuition balance was not also paid in full.

Appellant and St. Albans School exchanged several letters in March and April of 2010, attempting to establish a payment schedule based on the expected probate of appellant's father's estate. On March 17, St. Albans School agreed to reconsider its decision not to allow A.B.S. to re-enroll if it received confirmation by March 19 that the estate would pay the outstanding tuition balance by the end of March and the following year's tuition by July 5. On March 19, St. Albans received a check for $2,000 from A.B.S.'s step-grandmother. Appellant approved that the check be applied to payment of outstanding tuition to ensure that A.B.S. could finish the 2009-10 school year. Consequently, St. Albans School agreed to refrain from expelling A.B.S.; it also agreed to again modify the deadline for payment, upon receipt by April 8 of a letter on behalf of the estate confirming that settlement had been reached and that the estate would pay the remaining 2009-10 tuition ($15,990) by April 13, and the 2010-11 tuition (less any choir stipend and financial aid) by July 5. On March 25, appellant asked to meet with Parker to discuss additional flexibility in the payment schedule due to further delay in the probate proceedings. Appellant provided a copy of appellant's settlement

agreement with the estate, which provided for payment of the outstanding tuition, and the following year's tuition by the dates set by St. Albans School. He also attached a copy of a letter from the estate's attorney setting out the steps necessary to obtain court approval and implement the settlement.[2] St. Albans School remained firm, however, and on April 1, Parker informed appellant that A.B.S. would not be able to return for the 2010-11 school year if the tuition (for both 2009-10 and 2010-11) was not paid in accordance with the previously established timetable.

On April 2, appellant wrote a letter to Wilson, in which he reprised the situation and the impossibility due to legal requirements in the probate proceeding of a payment from his father's estate by the deadlines in Parker's letter. "[I]nvoking the last available option to me," appellant stated that he would institute litigation if St. Albans School did not agree "to wait the 45 or 50 days it will take to get the Florida Probate Court's approval for the payments that are due St. Albans." He attached a copy of the proposed complaint naming the School, the

---

[2] In the letter, the estate's attorney noted that "there are a number of persons who must sign the agreement before we have an agreement" and several motions that had to be filed in court before there could be a final order approving the settlement. Counsel added that "I personally will make it a priority to move the process along and hopefully reach the point of the fully executed and court-approved agreement. You however will need to be the person who communicates with St. Albans and lets them know where the process stands."

National Cathedral and PECF as defendants that, appellant said, would "open a Pandora's box of legal issues." On April 15, Parker responded on Wilson's behalf, stating that although A.B.S. would be permitted to complete the year, "[i]n light of the fact that the deadline for paying your son's long past-due tuition has come and gone," A.B.S. could not return for the following school year. On April 22, the Director of Music of the National Cathedral notified appellant that if A.B.S. was no longer enrolled at St. Albans School, he could not continue as a Boy Chorister the following term.

On April 6, appellant filed the complaint he had previewed to Wilson in the Superior Court, raising several claims for declaratory judgment and damages related to the tuition dispute with St. Albans School; he filed an amended complaint on May 21. On May 27, appellees answered and filed a counterclaim seeking the balance of unpaid tuition for the 2009-10 school year and attorney's fees. On September 29, appellant moved to amend his first amended complaint to add a new count, which the trial court denied on June 1, 2011. Appellant and appellees each filed two motions for partial summary judgment. The trial court denied appellant's motions for summary judgment and granted appellees' motions for summary judgment, with the result that appellant's complaint was dismissed and appellees' counterclaim for unpaid tuition was granted. The trial court entered its final Order of Judgment on April 7, 2014, in which it granted attorney's fees to

appellees. Appellant filed a timely notice of appeal.

## II. Analysis

Appellant raises a number of issues on appeal, which we have grouped into categories: procedural claims, summary judgment, and judicial bias.

## A. Procedural Claims

1. *Amendment to Complaint*

Appellant contends that the trial court erroneously denied his request to amend his First Amended Complaint to add a claim for negligent infliction of emotional distress, which he argues only became legally possible following this court's decision in *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 816 (D.C. 2011) (en banc).

We review a trial court's denial of a motion to amend a complaint for abuse of discretion. *Taylor v. D.C. Water & Sewer Auth.*, 957 A.2d 45, 51 (D.C. 2008). Once a responsive pleading has been served, a party may amend a pleading only by consent of the adverse party or with leave of the court, which must permit the amendment if "justice so requires." *Id.* (quoting *Sherman v. Adoption Ctr. of*

*Washington, Inc.*, 741 A.2d 1031, 1037 (D.C. 1999)). In exercising discretion, the trial court considers several factors: "(1) the number of requests to amend made by the movant; (2) the length of time the case has been pending; (3) bad faith or dilatory tactics on the part of the movant; (4) the merit of the proffered pleading; and (5) prejudice to the nonmoving party." *Id.* (quoting *Sherman*, 741 A.2d at 1038).

The trial court did not abuse its discretion in denying appellant's motion to amend because it considered "the merit of the proffered pleading" and properly concluded that appellant's proposed claim for negligent infliction of emotional distress did not have merit. In *Hedgepeth*, we articulated the elements of a claim for negligent infliction of emotional distress where the allegedly injured person (here, A.B.S.) was not in the "zone of physical danger" that had previously been a required element of the cause of action. 22 A.3d at 799-800. To make out a claim under the principles laid out in *Hedgepeth*, appellant must establish that "(1) [appellees had] a relationship with [A.B.S.], or [had] undertaken an obligation to [A.B.S.], of a nature that necessarily implicates [A.B.S.'s] well-being, (2) there is an especially likely risk that [appellees'] negligence would cause serious emotional distress to [A.B.S.], and (3) negligent actions or omissions of [appellees] in breach of that obligation have, in fact, caused serious emotional distress to" A.B.S. *Id.* at 810-11.

Appellant's proposed amended complaint failed to allege facts necessary to satisfy these required elements. There is no allegation to support the first prong: that appellees had the type of relationship with A.B.S. or had undertaken an obligation to A.B.S. that necessarily implicated his emotional well-being, as required by *Hedgepeth*. This is a determination of law for the court. *See id*. at 812-15 & n.39. The relationship between a student and his school or the musical director of his choir program is not enough, without more, to impose the predicate duty of care for a claim of negligent infliction of emotional distress. Moreover, in this case, the decision not to permit A.B.S. to re-enroll for 2010-11 that appellant claims was negligent and injured his son was taken by appellees pursuant to the 2009-10 enrollment contract appellant signed. Even though the existence of a contract between the parties does not automatically disqualify a claim in tort for negligence, contractual terms nonetheless govern the contracting parties' respective rights and responsibilities. *See Hedgepeth*, 22 A.3d at 816 n.42. The enrollment contract at issue in this case expressly disallows "special, incidental or consequential damages arising out of . . . any suspension or dismissal of the student, regardless of any notice of such damages." In addition, the proposed amendment to the complaint does not allege facts to support *serious* emotional distress of the type and degree required to sustain an action for negligent infliction of emotional distress, even if we assume that A.B.S. would have been

understandably disappointed and hurt when he was unable to re-enroll at St. Albans School and continue to sing in the choir.[3]  *See id.* at 817 (referring to "serious and verifiable" emotional distress that is "acute, enduring or life-altering").  For these reasons, the trial court did not abuse discretion in denying appellant's motion to amend the complaint to add a claim for negligent infliction of emotional distress.

## 2. *Discovery*

Appellant contends that the trial court also abused its discretion in limiting his ability to conduct discovery.  Appellant filed a motion to compel production of "[a]ll Documents relating to the application for financial aid to Defendant St. Albans School on behalf of each student in Forms A, B, C, I and II for the school

---

[3]  In an affidavit, appellant states that A.B.S. was deeply troubled about the prospect of not being able to finish the chorister program and was "emotionally traumatized . . . by [that] prospect. . . . and has suffered . . . as a result of the hostile chorister environment" that was created once it was known he would not be returning as a Boy Chorister.  Specifically, appellant states that once, during a performance, the sheet music was taken from A.B.S. and he was forced to sit out the service while the other boys continued; A.B.S. was denied solo performances with "full knowledge" that doing so would dishearten him; the appointment of another Form A student as Head Chorister was announced with knowledge that it "would be used—and was used—to humiliate A.B.S. by his peers."  According to appellant, these actions evidenced "a pattern and practice of intentionally undermining A.B.S.'s self-confidence and worth by creating a hostile Chorister environment."

years 2008-2009 and 2009-2010 with redactions of identifying personal information." Appellees refused to comply on the ground that the documents requested were irrelevant and production would be unduly burdensome. The trial court denied appellant's motion, concluding that (1) the financial aid documents concerning other students were not reasonably calculated to lead to the discovery of admissible evidence concerning the promises exchanged between appellant and appellees with respect to financial assistance for A.B.S., and (2) production of the requested documents would be unduly burdensome to appellees even if identifying information were redacted.

To warrant reversal of the trial court's denial of a motion to compel discovery, the movant must show both that the trial court abused its discretion and that the denial caused prejudice. *See Franco v. District of Columbia*, 39 A.3d 890, 896 (D.C. 2012). A party is entitled to discover relevant admissible evidence and relevant information that "appears reasonably calculated to lead to the discovery of admissible evidence." Super. Ct. Civ. R. 26 (b)(1). A trial court has broad discretion in considering motions to compel discovery and may weigh a variety of factors in reaching a decision. *See Kay v. Pick*, 711 A.2d 1251, 1256 (D.C. 1998). A request may be denied if it is overly broad or is "not warranted by [the] facts and circumstances of" the case. *Phelan v. City of Mount Rainier*, 805 A.2d 930, 942-44 (D.C. 2002). This court will reverse a trial court's decision only if it is "clearly

unreasonable, arbitrary, or fanciful." *Kay*, 711 A.2d at 1256.

Appellant argues that the trial court's decision was "unreasonable and arbitrary" because relevancy, for discovery purposes, is construed "most liberally," citing *Dunn v. Evening Star Newspaper Co.*, 232 A.2d 293, 295 (D.C. 1967), and the financial aid documents he requested would help prove that, contrary to representations about the manner in which all students, including choristers, would be treated with regard to financial aid, "it was the practice of St. Albans School to *not* grant financial aid to Boy Choristers in the same amounts that non-Boy Choristers received." Appellant argues that the financial aid documents of other students are relevant to his claim that St. Albans School made four misrepresentations: (1) every student admitted to St. Albans School would be able to attend regardless of his family's financial situation; (2) a family's financial situation would not prevent a student from attending; (3) twenty-seven percent of students received financial aid, with an average amount of $21,053 in aid; and (4) the National Cathedral would pay choristers a stipend of forty-five percent of the annual tuition. Had St. Albans School provided to A.B.S. the "average" amount of aid plus the forty-five percent chorister stipend, A.B.S.'s tuition would have been fully covered. Instead, appellant argues, A.B.S. was "punished" for being a Boy Chorister because the stipend he received for his chorister duty was less than had been represented and was taken into account in determining the amount he would

receive in financial aid. Appellant also argues that appellees offered no proof that production of the financial aid documents would be unduly burdensome.

We conclude that the trial court did not abuse discretion in denying appellant's motion to compel discovery of other students' financial aid documents. Even assuming that the records or derivative evidence would be admissible, appellant does not explain *how* these documents would support his claim that A.B.S. was "punished financially" because his stipend as a Boy Chorister was taken into account in evaluating his application for financial aid. The financial aid documents appellant sought cannot prove that A.B.S. was "penalized" because, although appellant argues to the contrary, there is no admissible evidence that St. Albans School promised him that the chorister stipend would not be considered in awarding financial aid, *see infra* Part B.3.b (noting that appellant's evidence of this assertion is inadmissible hearsay). In fact, the evidence in the record is to the contrary as appellees have provided evidence, through the affidavit of the Director of Finance at St. Albans School, that "all sources of tuition payment, including chorister scholarships" are considered when reviewing financial aid applications, such that all families were treated the same in determining the basis on which financial aid awards were calculated. In short, the applications for financial aid and awards to other students would not prove or lead to evidence that A.B.S. was penalized and not treated like other students because his chorister stipend was

considered a source of tuition payments in the evaluation of his request for financial aid.

Additionally, there is scant reason to believe that the requested financial aid documents would support appellant's claim that four specific misrepresentations were made to him. Appellant's first two alleged misrepresentations are essentially the same: that St. Albans School falsely represented that the family's financial situation would not affect A.B.S.'s ability to attend St. Albans School once he was admitted. It is difficult to see how financial aid records that pertain to other students who were already attending the school would shed light on the alleged falsity of this statement as it pertained to A.B.S.'s family's financial situation. Appellant's second alleged misrepresentation—that twenty-seven percent of St. Albans School students received financial aid, with an average award of $21,053— is irrelevant to his ultimate claim; regardless of whether the financial aid records confirmed or discredited this figure, the *average* amount of financial aid awarded to students with varying financial resources would not prove appellant's overall claim of disparate treatment of A.B.S. because he was a Boy Chorister. Finally, the financial aid records of other students would not prove that, as appellant alleged, the National Cathedral falsely represented to appellant that A.B.S. would receive forty-five percent of tuition as an annual stipend for being a chorister.

Considering the dubious relevance of the requested documents against the burden of redacting and risk of exposing confidential financial information of students' families in a small school community, the trial court did not abuse discretion in denying appellant's motion to compel production of St. Albans School's financial aid records.

## B. Summary Judgment

### 1. *Constitutionality of Summary Judgment*

Appellant makes a frontal challenge to summary judgment, contending that it is a denial of the constitutional right to a jury trial. His argument is that because a jury has the right to determine "both law and fact" in civil trials, summary judgment, as a means of final adjudication, is unconstitutional under the Seventh Amendment. Appellant is wrong about the role of the jury and his legal argument is without merit.[4]

"[T]he constitutionality of summary judgment has long been settled" by the Supreme Court. *Mixon v. Wash. Metro. Area Transit Auth.*, 959 A.2d 55, 58 (D.C.

---

[4] Appellant's constitutional challenge is at odds with his trial strategy, as he sought summary judgment on his claims against appellees.

2008) (citing *Sartor v. Ark. Nat. Gas Corp.*, 321 U.S. 620, 627 (1944), and *Fidelity & Deposit Co. v. United States*, 187 U.S. 315, 320 (1902)). The jury is a finder of *fact*; it does not determine the law. The jury is charged with applying the law, as instructed by the judge, to the facts found by the jury. Consequently, if there is no material fact in dispute, the parties do "not suffer injury to any interest protected by the Seventh Amendment." *Id.*

An appellate court reviews the trial court's grant of summary judgment *de novo*, using the same standard the trial court uses to evaluate the motion. *See Young v. U-Haul Co. of the District of Columbia*, 11 A.3d 247, 249 (D.C. 2011). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Id.* (quoting *Bruno v. Western Union Fin. Servs., Inc.*, 973 A.2d 713, 717 (D.C. 2009)); Super. Ct. Civ. R. 56 (c). The movant has the initial burden to demonstrate the absence of a genuine issue of material fact, but once the movant has done so, the burden shifts to the non-movant to show a factual dispute, by presenting admissible evidence of a *prima facie* case to support his cause of action. *See id.* Here, the trial court did not deprive appellant of his constitutional right to a jury trial because, as we discuss *infra*, there were no material facts in dispute and appellees were entitled to summary judgment as a

matter of law.

2. *Appellant's Claims for Declaratory Judgment*

a) *PECF's Corporate Status*

Appellant contends that the trial court was without authority to enforce the payment provision in the 2009-10 re-enrollment contract because PECF is not validly incorporated and therefore its actions, being *ultra vires*, have no legal effect. His argument is that because PECF was originally chartered by Congress for the purpose of "promot[ing] religion," its government charter is prohibited by the Establishment Clause of the First Amendment, and, *a fortiori*, Congress did not have the authority to create PECF. The trial court denied appellant's first motion for partial summary judgment, which sought to establish that PECF was not validly incorporated, and granted appellees' motion for summary judgment on that claim, concluding that no issue of material fact existed regarding PECF's incorporation status and that appellees were entitled to judgment as a matter of law on that issue.

The trial court did not err in granting summary judgment to appellees on the issue of PECF's incorporation status because the evidence of record establishes that PECF is properly incorporated as a nonprofit corporation under the law of the District of Columbia. There is therefore no need to address appellant's First

Amendment challenge, based on PECF's original congressional charter. Although PECF was originally chartered by Congress in 1893, Act of Jan. 6, 52 Cong. Ch. 20, 27 Stat. 414 (1893), the evidence of record is that it was re-incorporated in 1998 under the District of Columbia Nonprofit Corporation Act (Act), D.C. Code §§ 29-401 et seq. (2012 Repl.).[5] The Act allows for the incorporation of nonprofit organizations for "any lawful purpose," D.C. Code § 29-403.01, including religious organizations or organizations with religious purposes. D.C. Code § 29-401.02 (4) & (32); -403.01.[6] Once the articles of incorporation are filed, a business entity is incorporated under the Act. D.C. Code § 29-402.03 (b) ("The filing of the articles of incorporation . . . is conclusive proof that the incorporators satisfied all conditions precedent to incorporation . . . ."). Appellees submitted Parker's affidavit, dated April 28, 2010, which attested to PECF's incorporation under the Act in 1998 and attached PECF's Certificate of Acceptance of the terms of the

---

[5] At the time PECF incorporated under District of Columbia law, the Act was codified at D.C. Code §§ 29-301.01 et seq. (2001 & 2007 Supp.). The Act has since been amended and recodified at D.C. Code §§ 29-401 et seq. (2012 Repl.). For ease of reference, we use the current codification where it is substantively unchanged with respect to the relevant provisions cited.

[6] Appellant makes no argument that the Act's provisions for religious organizations violate the First Amendment's Establishment Clause. *See Committee for Public Education and Religious Liberty v. Regan*, 444 U.S. 646, 653 (1980). ("[A] legislative enactment does not contravene the Establishment Clause if it has a secular legislative purpose, if its principal or primary effect neither advances nor inhibits religion, and if it does not foster an excessive government entanglement with religion.").

Act.[7]   Appellant has not presented evidence controverting that PECF is incorporated under the Act.  Consequently, the evidence of record supports that PECF is a valid District of Columbia nonprofit corporation.  The trial court therefore properly granted summary judgment in favor of appellees because there was no disputed issue of fact regarding PECF's corporate status, and appellees were entitled to judgment as a matter of law on the question of whether they may enter into and enforce contracts.[8]  *See* D.C. Code § 20-403.02 (2012 Repl.) (setting out that powers of nonprofit corporation are "the same powers as an individual to do all things necessary or convenient to carry out its affairs").

b. *Harriet Lane Johnston's Bequest*

Appellant contends that St. Albans School was required to permit choristers to attend the school without paying tuition, pursuant to the bequest of Harriet Lane

---

[7]   In 1998, the Act provided that upon the issuance of a Certificate of Acceptance, a corporation "shall be entitled to and be possessed of all of the privileges and powers and franchises and be subject to all of the provisions of this chapter as fully and to the same extent as if such corporation had been originally incorporated under this chapter. . . ."  D.C. Code § 29-599.6 (1998) (repealed 2012).

[8]   We also question whether appellant has standing to challenge PECF's actions as *ultra vires*; appellees, however, have not made this argument.  *See* D.C. Code § 29-403.04 (prohibiting challenges to validity of nonprofit corporation's actions as *ultra vires* except by certain specified individuals, e.g., the Attorney General, directors, members of the corporation).

Johnston that provided for the establishment of the School.  Appellant contends that the 1903 Codicil to Ms. Johnston's Will requires the School to offer free education to all choir boys that serve the National Cathedral.  The Codicil states:

Whereas, by a codicil to my said will, the said codicil being dated June tenth, 1899, I have bequeathed to the Protestant Episcopal Cathedral Foundation the sum of two hundred thousand dollars ($200,000.), upon certain trusts in said codicil set forth; Now I hereby modify said bequest by increasing the same to the sum of three hundred thousand dollars ($300,000.) and by these further provisions, namely:  That not more than one half of the said sum, that is not exceeding one hundred and fifty thousand dollars ($150,000) shall be used for construction of the building, which is to be known as the "Lane Johnston Building" the site for which and the necessary appurtenant grounds for which are to be provided by the said Protestant Episcopal Cathedral Foundation, and the balance of said sum of three hundred thousand dollars ($300,000.) not used for the construction of the said building shall be invested by said Protestant Episcopal Cathedral Foundation as an Endowment fund to be known as the "Lane Johnston Fund" and the income to be used for the maintenance of said school for boys.  While not restricting the general objects of said School *it is my wish that the said school shall be so conducted and the said Fund so applied as specifically to provide for the free maintenance, education and training of Choir-boys, primarily those in the service of the Cathedral.*  Reposing special confidence in the discretion in this regard of the Rev. Philip M. Rhinelander, I further direct that he shall have charge and supervision of the selection of the site for and the construction of the said School building and of the organization and management of the School, but in the event of his death or inability or declination to act the whole of said matters are committed to the said

Protestant Episcopal Cathedral Foundation.

(Emphasis added to highlight provision relied upon by appellant). The trial court denied appellant's motion for partial summary judgment, and granted appellee's motion, on the interpretation and effect of Ms. Johnston's Codicil, concluding that the language in the Codicil was precatory rather than mandatory. Appellant argues that the trial court's conclusion that the language of the Codicil was precatory misinterprets Harriet Lane Johnston's intent.

To determine the testator's intent, the court looks first to the language of the document; it will consider extrinsic evidence only if the language is ambiguous. *See Davis v. Davis*, 471 A.2d 1008, 1009 (D.C. 1984) (holding that trial court properly construed the language of the will as unambiguous and that extrinsic evidence was therefore not necessary). The trial court considered only the language of the document and did not find it to be ambiguous. Therefore, no extrinsic evidence was considered. Appellant does not argue that the Codicil's language is ambiguous and extrinsic evidence should have been considered. Thus, as no issue was presented that required fact-finding by a jury, the matter was properly considered for summary judgment. *See Davis*, 471 A.2d at 1009. Interpretation of the language of a will within the four corners of the document, as with interpretation of a contract, is a question of law for the court. *See Wyman v.*

*Roesner*, 439 A.2d 516, 523 n.6 (D.C. 1981). Thus, we review the court's interpretation of the Codicil de novo.

Generally, a court will interpret a provision addressed to the executor of a will as a mandatory directive concerning the disposition of the bequest, while language presented as a "wish" directed to the devisees is merely precatory (i.e., the expression of a preference rather than a mandatory directive or command) and does not control the disposition of the property. *Davis*, 471 A.2d at 1009; *see also Cabaniss v. Cabaniss*, 464 A.2d 87, 91-92 (D.C. 1983) (noting that the nature of the language—whether it was mandatory or precatory—is a factor the court uses to determine if an individual intended to create a trust).

We agree with the trial court that the Codicil is unambiguous and precatory with respect to Ms. Johnston's "wish" for the free education of choristers. As an initial matter, in the portion of the Codicil on which appellant relies (highlighted above) Ms. Johnston was addressing the devisee under the Will, PECF, rather than the executor. Moreover, this section of the Codicil states how Ms. Johnston "wish[es]" that the bequest be used by PECF in the operation of the school. The language of the Codicil itself demonstrates that Ms. Johnston was capable of distinguishing—and did distinguish—between precatory and mandatory language. In comparison to the surrounding language in the Codicil and the rest of the Will,

the provision in the Codicil that refers to free education for choir boys is precatory. For example, with regard to the increase in the bequest sum, the erection of the building, the establishment of the school, and selection of the supervisor for the building of the school, Ms. Johnston used clear mandatory language such as "shall" and "I direct." By contrast, the language in the clause concerning the "free maintenance, education and training of Choir-boys" is preceded by the language "it is my wish" and is further conditioned ("[w]hile not restricting the general objects of said School"), signifying that PECF is to have discretion in how the bequested funds are used in the operation of the school. It is thus apparent that although Ms. Johnston's intent was to *require* that one half of the bequest be used to build the school and the other half to maintain and operate the school, she expressed a *preference*, if feasible in conjunction with the operation of the school, that choir boys be able to attend without paying tuition. Similarly, the language of the rest of Ms. Johnston's Will demonstrates measured and deliberate use of mandatory language, *see, e.g.*, Johnston Will at 9 para. 56[9] (using "I charge" and "shall"); 9 para. 57 (using "I direct" and "shall"); 11 para. 67 (using "[i]t is my will" and "shall"), which contrasts with the use of other clearly conditional language in the Will, *see, e.g.*, *id.* at 3 para. 21 (using "upon condition that"), and the "wish"

---

[9] Like the trial court, we refer to the numbered pages in the version of the Will filed in the trial court, as well as the paragraph number, as counted by the trial court.

language in the Codicil.

We agree with the trial court that the language of Ms. Johnston's bequest is unambiguous and does not mandate that choristers attend St. Albans School tuition-free.

c. *Promise of choral stipend*

Appellant's complaint alleged that "as an inducement to commit to the Chorister program" appellees promised to pay forty-five percent of tuition at St. Albans School if A.B.S. agreed to join the National Cathedral choir. The complaint sought a declaratory judgment that appellees were bound by their promise and had breached it when the chorister stipend was reduced to twenty-eight percent in 2009-10. The trial court granted summary judgment to appellees on this claim, ruling that appellant had not presented evidence that created a question of fact as to whether such a promise was made and that the evidence appellant had presented would not support a jury verdict in his favor.

Appellant contends that his affidavit suffices to defeat summary judgment. In the affidavit appellant states that the National Cathedral's Music Director Michael McCarthy promised a choral stipend at least in the amount of forty-five

percent of A.B.S.'s tuition. The alleged promise took two forms, a letter dated February 28, 2008, and an oral statement. This evidence is insufficient, as a matter of law, to base a judgment for appellant. The letter to appellant from McCarthy concerned the 2008-09 school year, and did not constitute a binding promise; rather, McCarthy stated that, although the scholarship amounts had not been determined, the National Cathedral *hoped* that the stipend would amount to forty-five percent of that year's tuition. ("At the time of writing this letter the value of the scholarship for 2008-2009 has not been confirmed. However, we are hopeful that you should expect somewhere between 43% - 45% of the annual fees for St. Albans School, as determined by the Cathedral."). By its terms, McCarthy's letter did not create a binding promise—but expressed a "hope"—that National Cathedral would provide such a stipend, and made clear that the amount was yet to be "determined by the Cathedral." A.B.S. did, in fact, receive a stipend in that range (forty-three percent) for the 2008-09 school year, and appellant makes no claim with respect to the 2008-09 stipend. As appellant states in his affidavit of July 28, 2010, the National Cathedral informed him in February of 2009 that the chorister stipend for the 2009-10 school year would be reduced to twenty-eight percent, which prompted appellant to apply for financial aid, which he received. Appellant's statement that McCarthy also made an oral promise does not fill the evidentiary gap. Appellant's affidavit of May 5, 2010, filed in opposition to appellees' first motion for partial summary judgment alleges that McCarthy told

him "in the summer and fall of 2007 and the spring of 2008. . . that the Chorister Stipend was presently 45% of the Defendant St. Albans School tuition and that it was likely to increase." This alleged statement arguably could be interpreted as referring to future years. As with the letter, however, appellant's statement about what McCarthy allegedly said is not a promise but a guess (or hope) about the "likely" value of future stipends for choristers. Neither McCarthy's letter nor his statement, or both together, would permit a reasonable jury to find that appellees made a binding promise that A.B.S. would receive a stipend worth forty-five percent of tuition each year he was a chorister. We, therefore, agree with the trial court's grant of summary judgment to appellees on the claim of breach of promise.[10]

3. *Appellant's Claims for Damages*

a) *Breach of implied covenant of good faith*

Appellant contends that there were two disputed facts that prevented

---

[10] We also doubt that appellant could prove that there was a breach. As noted, A.B.S. received a choral stipend of forty-three percent of tuition for the 2008-09 school year. The following school year he received a choral stipend of $8,907 plus $6000 in financial aid, which taken together, amounted to forty-five percent of the $32,990 tuition for 2009-10. As we discuss *infra* at B.3.b., there is no evidence to support appellant's claim that the stipend would not be considered as part of a package of tuition assistance.

summary judgment for appellees on his claim that St. Albans School breached the covenant of good faith implied in the 2009-10 re-enrollment contract: (1) St. Albans School's reason for denying A.B.S.'s re-enrollment for 2010-11, and (2) whether the discretionary language of the 2009-10 re-enrollment contract is unconscionable.

The first point is factually contested, appellant argues, because St. Albans School provided conflicting testimony regarding the school's basis for denying A.B.S. re-enrollment for the 2010-11 school year. Appellant contends that Parker first stated in his April 27, 2010 affidavit that A.B.S. was not permitted to return because of appellant's actions, which "made a positive and constructive relationship impossible and that such a step would be in the school's best interests." Appellant then points to the June 10, 2010 deposition of headmaster Wilson, in which he stated that the only reason that A.B.S. was not permitted to re-enroll was because appellant failed to pay his tuition. Appellant argues that Wilson then "changed his reason," explaining in a supplemental affidavit, dated August 31, 2010, that A.B.S. was not permitted to return both because of the unpaid tuition *and* because of appellant's actions.

We disagree that the statements appellant identifies suffice to call into question that St. Albans School could lawfully deny re-enrollment to A.B.S. We

note that as Wilson explained in his August 31 affidavit, the two reasons were interrelated. Even if the statements reveal some ambiguity about the precise or primary reason or reasons for the decision not to permit A.B.S.'s re-enrollment, that fact is not material to appellant's claim that the action was taken in bad faith and therefore is insufficient to defeat summary judgment. The 2009-10 re-enrollment contract required appellant to pay A.B.S.'s tuition in full; failure to do so constituted grounds for expulsion and denial of re-enrollment for the next school year. St. Albans School also had the discretionary authority afforded to Wilson under a separate provision of the contract to decline A.B.S.'s re-enrollment under certain circumstances. Whether St. Albans School had one or more grounds for the denial of A.B.S.'s re-enrollment is not material to appellant's claim for breach of contract based on the implied covenant of good faith as both reasons cited were grounded in the contract that appellant signed.

The implied duty of good faith imposes an obligation on a contracting party not to "evade[] the spirit of the contract, willfully render[] imperfect performance, or interfere[] with performance by the other party," *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006) (quoting *Paul v. Howard Univ.*, 754 A.2d 297, 310 (D.C. 2000)), but it does not require a party to waive or rewrite the terms of the contract. Here, in fact, St. Albans School accommodated appellant by not exercising the option of expelling A.B.S. mid-year, accepting only a $2,000

payment to allow him to complete the school year, even though approximately half of his tuition remained unpaid. Moreover, on at least three occasions, at appellant's request St. Albans School extended the due date of the outstanding tuition balance before finally deciding not to allow A.B.S. to re-enroll for the following school year when the extended deadlines were not met. Appellant's argument is essentially that St. Albans School should have continued to forbear, especially once he provided evidence that he had reached a proposed settlement with his father's estate that would cover A.B.S.'s tuition. But the letter from the estate's counsel he provided to the School pointed out that there were still a number of further signatures required and steps to be taken before the settlement received court approval. Although the situation looked promising, it was not a sure thing. Appellant's argument that his inability to pay should have been foreseen because he had advised the school that his personal financial situation was precarious,[11] ignores that appellant was obviously aware of his own straitened financial circumstances when he signed the contract agreeing to pay his son's tuition. On this record, no reasonable jury could find that the school acted in bad faith, arbitrarily or unreasonably. *Id*. at 202.

Appellant also contends that the "unbridled" discretion to expel or deny re-

---

[11] In the financial aid application filed in 2009, appellant indicated he had no income and that his wife had a significant decrease in her income.

enrollment to A.B.S. granted to the St. Albans School headmaster under the contract is unconscionable because the object of the contract was a child, and it allowed appellees to "economic[ally] exploit[]" A.B.S.'s service to the National Cathedral choir and harm his "mental, spiritual, moral and social development by denying him the right to complete his promised pilgrimage," i.e., his three-year participation as a chorister in the National Cathedral. Appellant also argues that St. Albans School used the discretionary clause to prevent appellant from exercising his First Amendment right to petition for judicial relief.

Whether the re-enrollment contract contains unconscionable provisions is not a material question of fact in dispute. As a threshold matter, we reiterate that St. Albans School had grounds to deny A.B.S.'s re-enrollment for non-payment of tuition as the contract provides for expulsion or non-enrollment of students "whose tuition and fees are not paid as scheduled," independent of the further discretion provided for in the contract. Moreover, the contract does not vest "unbridled discretion" in the headmaster: a student cannot be expelled or refused re-enrollment for *any* reason; rather, the contract permits such action "if the Headmaster concludes, in his sole and absolute discretion, that the actions of the student's parent (or guardian) make . . . a positive and constructive relationship impossible or otherwise interfered with the school's accomplishment of its mission" or if "such action would be in the best interest of the student or the

school." In this case, the school has cited specific examples to support the denial of A.B.S.'s re-enrollment based on appellant's conduct: that appellant "falsely led the school to believe that payment of the tuition for the 2009-10 school year was imminent"; that appellant responded to the school's final deadline for resolving the unpaid tuition "with angry words and by threatening the school with litigation"; and that appellant "threatened that, unless the school acceded to his demands, he would challenge whether the Protestant Episcopal Cathedral Foundation was properly chartered and he would embarrass the school with adverse publicity." The cited reasons were specific and not fanciful; they are supported by the record in this case, as appellant in fact followed through: he sued and, among other things, challenged PECF's corporate status, a challenge that, as we have discussed, is totally without merit. Appellant's First Amendment argument concerning his right to seek judicial redress is also without merit, as the Constitution imposes limits on the state or state agents, not private parties such as appellees. *See Lloyd Corp. v. Tanner*, 407 U.S. 551, 567 (1972). Moreover, appellant's actions in the trial court and in this court belie his claim that his desire to petition for judicial relief has been stymied by appellees.

b) *Misrepresentation*

In his complaint for damages, appellant claims that appellees made several misrepresentations that induced him, in 2008, to sign a multi-year commitment that A.B.S. would fulfill his duties as a Boy Chorister at the National Cathedral through the eighth grade, which required that he also be enrolled as a student at St. Albans School. Specifically, appellant claims that the following representations were made to him and were false: (1) that each chorister would receive a stipend worth forty-five percent of tuition at St. Albans in recognition of his time commitment to the National Cathedral choir; (2) that this stipend would not be considered by St. Albans School in arriving at awards for financial aid; (3) that a family's financial situation would not prevent a student who has been admitted from attending St. Albans School; and (4) that financial aid awards are calculated using a computerized system that treats each family the same in assessing their demonstrated need.

In granting summary judgment for appellees on the claim of misrepresentation, the trial court concluded that even assuming that the false statements appellant alleged were made, they would not support an actionable claim for misrepresentation. The trial court reasoned that appellant was already aware of the amounts that A.B.S. would receive in the form of a choir stipend and financial aid for the 2009-10 school year and, therefore, could not have reasonably relied on the alleged misrepresentations when he signed the enrollment contract for

that year, in which he agreed to pay the tuition balance. On appeal, appellant argues, and we agree, that the trial court's temporal focus was too narrow. If all that were at issue in the litigation with respect to the misrepresentation claims were a defense to appellees' counterclaim for the 2009-10 tuition, we would agree with the trial court's reasoning. But as appellant points out, his complaint took a broader view and was grounded on his reliance on those misrepresentations when he made the multi-year commitment in 2008, before the initial enrollment of A.B.S. at St. Albans School for the fifth grade, which required that A.B.S. remain enrolled at St. Albans School through the eighth grade as a condition of A.B.S.'s participation in the National Cathedral choir.[12] Appellant thus claims economic

---

[12] The Eighth Claim of appellant's complaint, seeking damages for misrepresentation, alleged as follows:

> 46. Defendants made false representations to Plaintiff, to wit, that (i) in recognition of the time commitment required of Boy Choristers, a choral stipend in the amount of 45% of the Defendant St. Albans School tuition would be given to each Boy Chorister, (ii) that the Chorister Stipend is not consider[ed] by Defendant St. Albans School in making the Financial Aid determination, (iii) a family's financial situation would not prevent a student from attending St. Albans School and (iv) St. Albans School's Financial Aid Committee awarded financial aid based upon the review of a computerized systematic analysis of the family's financial situation and treated each family the same.

(continued . . .)

and personal injury to him and his son as a result not only of the tuition dispute for 2009-10, but also the subsequent disruption of A.B.S.'s choral and school experience when he was not permitted to return to St. Albans School for the 2010-11 and subsequent school years, which rendered him ineligible to complete the choir commitment.

Nonetheless, even with that broader understanding of the scope of appellant's misrepresentation claim, we conclude that summary judgment was properly granted to appellees. *See Young*, 11 A.3d at 249 (noting that on appeal of summary judgment, review is de novo, taking into account whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law" (quoting *Bruno v. Western Union Fin. Servs., Inc.*, 973 A.2d 713, 717 (D.C. 2011)); Super. Ct. Civ. R. 56 (c). We come to this conclusion based on application of the substantive legal elements

_____

(. . . continued)

> 47.   The aforementioned representations were material facts upon which Plaintiff relied in enrolling his son in the multi-year Chorister Program and St. Albans School.

> 48.   Defendant St. Albans School, with knowledge of falsity of the aforementioned representations and with the intent to deceive Plaintiff, made the aforementioned representations.

of fraudulent misrepresentation and heightened evidentiary standard that apply to such a claim.

It is well established that to succeed on a claim of fraudulent misrepresentation, the claimant must prove six elements: (1) that a false representation was made, (2) in reference to a material fact, (3) with knowledge of its falsity, (4) with intent to deceive, and (5) action taken in detrimental reliance upon the representation. *See Virginia Acad. of Clinical Psychologists v. Grp. Hospitalization & Med. Servs., Inc.*, 878 A.2d 1226, 1233 (D.C. 2005) (citing *Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C. 1977)). Moreover, to be actionable, reliance on the misrepresentation must (6) have been justifiable. *See Sundberg v. TTR Realty, LLC.*, 109 A.3d 1123, 1131 (D.C. 2015) ("A misrepresentation is 'material' if it would be 'likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so.'" (quoting *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 438-39 (D.C. 2013))). To prevail at trial on a claim of fraudulent misrepresentation, the claimant has the burden to prove the elements by a heightened evidentiary standard, clear and convincing evidence. *Bennett*, 377 A.2d at 59.[13]

---

[13]  Special pleading requirements apply to claims of fraudulent misrepresentation. Because fraud is never presumed, it must be pled with particularity. *See Virginia Acad. of Clinical Psychologists*, 878 A.2d at 1233;

(continued . . .)

At the summary judgment stage, the trial court does not make credibility determinations or weigh the evidence, which are functions reserved for the trier of fact. But to survive a motion for summary judgment, there must be "at least enough evidence to make out a prima facie case in support of" the nonmovant's position if credibility determinations and inferences were drawn in the claimant's favor. *Id*. (quoting *Joeckel v. Disabled Am. Veterans*, 793 A.2d 1279, 1281-82 (D.C. 2002)). "And of particular relevance here, '[i]f the claim must be demonstrated by heightened proof to succeed, the nonmovant claimant must produce more substantial evidence to successfully oppose summary judgment.'" *Id*. (quoting 11 MOORE'S FEDERAL PRACTICE § 56.03[4] (3d ed. 2005)); *see Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986) (noting that "inquiry

_____

(. . . continued)

Super. Ct. Civ. R. 9 (b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally."). To comply with the more rigorous pleading requirement of Rule 9 (b), a complaint must allege "such facts as will reveal the existence of all the requisite elements of fraud. Allegations in the form of conclusions on the part of the pleader as to the existence of fraud are insufficient." *Bennett*, 377 A.2d at 59-60. Rule 9 (b)'s "particularity" standard requires that the complaint include the time, place and content of the false representations, the fact misrepresented, and what the defendant gained (or the plaintiff lost) as a result of the fraud. *United States ex rel, Totten v. Bombardier Corp*., 286 F.3d 542, 551-52 (D.C. Cir. 2002). Where the complaint names a number of defendants, Rule 9 (b) requires that the identity and role of individual defendants alleged to have made false representations be specified in the complaint. *See Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986).

involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at a trial on the merits"). If there is a genuine dispute on a material fact, summary judgment cannot be granted. However, for there to be a "genuine" dispute, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Id*. (quoting Super. Ct. Civ. Pro. R. 56(c)) (*cited in Lowry v. Glassman*, 908 A.2d 30, 36 (D.C. 2006)).

Appellant argues that several items of evidence created genuine disputes of material fact requiring resolution by the fact-finder such that his claim of misrepresentation should have survived summary judgment. These include his August 13, 2011, affidavit in support of his opposition to appellees' motion for summary judgment[14]; the St. Albans School website; and statements made by

---

[14] Appellant's August 13, 2011, affidavit states, at ¶ 17:

> The St. Albans School web page upon which I relied in enrolling my son states: "St. Albans wants to ensure that every boy admitted to the school knows that he will have the opportunity to attend, regardless of his family's financial situation." It was affirmative[ly] represented to me by Mike McCarthy, Defendant's Musical Director[,] that in recognition of the time commitment required of Boy Choristers, a choral stipend at least in the amount of 45% of the Defendant St. Albans School tuition would be given to each Boy Chorister and that the rate was likely to rise. Additionally, the

(continued . . .)

Music Director McCarthy in his February 28, 2008, letter and in his July 13, 2010 deposition. Having considered this evidence with respect to each of the specific claims of misrepresentation that appellant has made, and assuming that the jury would credit appellant's statement and draw reasonable inferences in appellant's favor, we conclude that the evidence falls short. In other words, there is no "genuine" dispute of material fact. *Anderson*, 477 U.S. at 248.

*The 45% Choral Stipend*

Appellant argues that his affidavit and McCarthy's February 28, 2008, letter concerning the amount of the choral stipend suffice to create a genuine issue of material fact that defeats summary judgment on his claims of misrepresentation regarding the amount of future choral stipends. Consistent with our earlier analysis of appellant's claim of breach of promise, we conclude that McCarthy's statement

_____
(. . . continued)

> Defendants represented that the Chorister Stipend was not consider[ed] by St. Albans School in making the Financial Aid determination. Finally, Defendants represented that St. Albans School's Financial Aid Committee awarded financial aid based upon the review of a computerized systematic analysis of the family's financial situation and treated each family the same. Each of these representations upon which I relied turned out to be false and were known to be false when made by the Defendants.

regarding the choral stipend for the 2008-09 school year did not constitute a promise that A.B.S. would receive a stipend worth at least forty-five percent of tuition every subsequent year he remained a chorister.  Even read in the light most favorable to appellant, McCarthy's statement in the letter is qualified as a hope and appellant's affidavit makes clear that the alleged statement (to the extent McCarthy made a statement beyond what was in the letter) related to a future occurrence that McCarthy thought was "likely."  Given those important qualifications, on the evidence of record, no reasonable jury could find for appellant on this claim of misrepresentation.  *See Carleton v. Winter*, 901 A.2d 174, 178 (D.C. 2006) ("[A] prophecy or prediction of something which it is merely hoped or expected will occur in the future is not actionable upon its nonoccurrence."  (quoting *Bennett*, 377 A.2d at 61)).

*The Chorister Stipend and Financial Aid*

The complaint also claims that appellees told him that the chorister stipend would not be considered in making financial aid determinations and that this was false because in making a financial aid award to A.B.S. for the 2009-10 school

year, St. Albans School in fact took into account the $9000 stipend, plus a $6000 financial aid to reach the approximately $15,000 of demonstrated financial need.[15]

To defeat summary judgment, appellant relied on the statement in his affidavit that appellees "represented that the Chorister Stipend was not consider[ed] by St. Albans School in making the Financial Aid determination." *See* n.14 *supra*.[16] Viewing the affidavit as a proffer of what appellant's testimony would be at trial and assuming further, as we must, that a jury would credit appellant's statement that such a statement was made to him, we conclude that appellant's testimony would not suffice to permit a reasonable jury to find that appellant proved, by clear and convincing evidence, that he reasonably relied on the alleged misrepresentation. The reasonableness of a person's reliance on an asserted false statement is a fact-intensive inquiry that is evaluated "on a case-by-

---

[15] Appellees do not dispute that the chorister stipend is taken into account. To the contrary, in his July 13, 2010 deposition, Parker stated that it was the policy of St. Albans School "to consider the chorister stipend, when making financial awards."

[16] Relatedly, appellant argues that McCarthy's statement that in appreciation for their efforts, boy choristers are given scholarships would be a misstatement if the stipends are taken into account in considering financial aid awards. Appellant also argues that the chorister stipends are "earned" by the Boy Choristers who must devote many hours of rehearsal and performance for the National Cathedral choir, which derives revenue from their performances. These arguments constitute reasons why the stipend *should not* be taken into account in the financial aid calculation, but they are not evidence that appellees misrepresented to appellant that it *would not* be taken into account.

case basis based on all the surrounding circumstances." *AES Corp. v. Dow Chem. Co.*, 325 F.3d 174, 179 (3d Cir. 2003) (*quoted in Burman v. Phoenix Worldwide Indus.*, 384 F. Supp. 2d 316, 329 (D.D.C. 2005)); *see Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 933 (D.C. 1992) (reliance on representation must be "objectively reasonable"); *see also* RESTATEMENT (SECOND) OF TORTS § 537 (1977) (reliance must be "justifiable"); *id*. at § 538 (whether reliance is justified is a question of materiality which employs a reasonable person standard). Whether there has been reasonable reliance is therefore usually a question for the jury, unless reliance on the misrepresentation is precluded as a matter of law.[17] But even when there is no legal impediment to reliance, there must be some evidentiary basis upon which the jury may determine whether the claimant's reliance was justified. Moreover, the evidence must be sufficiently probative to permit a jury to make the necessary finding by clear and convincing evidence. *See Bennett*, 377 A.2d at 59.

---

[17] *See, e.g.*, *Williams v. District of Columbia*, 902 A.2d 91, 96 (D.C. 2006) (affirming grant of summary judgment where proof of reasonable reliance was legally impossible); *Hercules & Co.*, 613 A.2d at 927-29 (holding that complete integration clause in contract made reliance on statement made outside of contract legally irrelevant and could not be considered in support of claim of fraud in the inducement).

In this case, the only evidence of record is appellant's affidavit concerning a "misrepresentation" made by "defendants" that the choral stipend would not be considered in making financial aid determinations. There is no specification at all about the manner in which the alleged misrepresentation was made (e.g., was it orally or in writing?), or about when it was made or the circumstances under which it was made. Nor is there any specification as to whether one, two or all of the defendants made the misrepresentation even though three separate operating entities are named in the complaint as defendants (PECF, National Cathedral, and St. Albans School). The individual who presumably made the false statement is not identified, leaving no clue as to the person's authority to make the alleged representation on behalf of any of the defendants. These factual details would be critical to a jury's evaluation of the reasonableness of appellant's reliance on the alleged statement as a credible representation binding any one of the defendants with respect to the consideration of the chorister stipend in financial aid determinations. Without such facts, the jury could only speculate.

There is no reason to expect (and appellant does not contend) that sufficient evidence would have been presented if the case had been allowed to proceed to trial. Indeed, the record supports the opposite inference. Appellees filed the motion for summary judgment on the misrepresentation claim on August 4, 2011. In opposing the motion, appellant referred only to his affidavit of August 13, 2011,

which contained the bare assertion that the misrepresentation had been made. Appellant had already deposed National Cathedral music director McCarthy and St. Albans School finance director Parker the previous year, on July 13, 2010. Appellant's opposition did not rely on (or even refer to) their affidavits, which clearly did not support appellant's claim that the representations appellant alleged was made to him.[18] Instead, appellant argued that the court should not decide the summary judgment motion at that time because he needed to complete discovery,

---

[18] The following exchange took place during the July 13, 2010, deposition of McCarthy:

> Q. [Appellant] Did you tell me or my ex-wife, that the chorister stipend will be applied in some fashion, against any financial aid[] request made at St. Albans School?
>
> A. [McCarthy] I may or I may not have done that. I do not know. But usually, the awards are made through St. Albans School. So, as I understand it, if there is a financial aid[] request which has been granted by the school, then the chorister stipend is put to off-set that.

At most, this exchange established that appellant was not informed by McCarthy that the stipend *would be* taken into account in the financial aid calculus. But it does not support the opposite proposition that is the premise of appellant's misrepresentation claim that he was affirmatively and falsely told that the chorister stipend *would not be* taken into account.

In his July 13, 2010 deposition, Parker stated that although he did not know whether the policy to consider chorister stipends in making financial aid determinations was "communicated to the chorister parents," he did know "that it is communicated that the choir stipend is for the payment of tuition at St. Albans School, and as such, the choir stipend is paid to the school, for the payment of tuition."

including the re-deposition of McCarthy "regarding tuition scholarships," of Parker regarding "the factual basis for denying all but $6000 to [A.B.S.] as financial aid for the 2009-2010 school year," and of Headmaster Wilson and others with whom he consulted regarding the decision not to permit A.B.S. to re-enroll for the 2009-10 school year. Appellant re-deposed Wilson and others concerning the re-enrollment question but there is no indication in the record that he re-deposed McCarthy or Parker, the persons he identified as relevant to the misrepresentation claim, nor does appellant argue on appeal that he tried but was prevented from deposing them anew. Thus, at the time the trial court granted summary judgment on the misrepresentation claim on February 6, 2013, discovery had been completed and the record was essentially the same as it was when appellees filed their motion two years earlier, with a vague and general assertion in appellant's affidavit about an alleged misrepresentation made by an undisclosed person on behalf of an unidentified defendant and without further elaboration about time, place or context. This does not begin to create a "genuine" issue of material fact for purposes of Rule 56 (c). We conclude that appellant has not met his burden to counter the motion for summary judgment with "significant probative evidence tending to support the complaint so that a reasonable fact-finder could return a verdict for the non-moving party." *Lowery*, 908 A.2d at 36.

*St. Albans School Website*

In opposing summary judgment on his claim of misrepresentation, appellant's affidavit stated that he relied on the statement on the school website that "St. Albans wants to ensure that every boy admitted to the School knows he will have the opportunity to attend, regardless of his family's financial situation." Appellant appears to interpret this statement to mean that A.B.S. should have received (in addition to the chorister stipend) financial aid in whatever amount was required to cover any tuition that his family was unable to pay.

Even if we assume that a jury were to credit appellant's statement that he took notice of this statement on the website and that he understood and relied on the statement as a blanket guarantee when he made the multi-year commitment in 2008, the question remains whether a jury could find, by clear and convincing evidence, that such reliance was justified.

Appellant's complaint and affidavit quote the same single sentence which is plucked from the St. Albans School website. A copy of the webpage itself, however, is also of record. We must view the sentence appellant claims misled him in the full context of the webpage to determine whether a jury could find that appellant reasonably relied on the one sentence to mean that his son would be able to continue to attend the school regardless of his family's changing financial

situation during the course of his enrollment at St. Albans School. The sentence appellant quotes appears in a section of the website describing a fundraising campaign:

> In September 2006, St. Albans School began the four-year public phase of the Centennial Campaign. Our "case for support" outlines our goals and opportunities as we move into our second century. St. Albans wants to ensure that every boy admitted to the School knows he will have the opportunity to attend, regardless of his family's financial situation. For this reason, we remain committed to a policy of meeting the full demonstrated financial need of all students offered admission to our School. Currently, approximately one out of four boys receives scholarship assistance. In the last five years, the average award has grown more than 58 percent. Looking ahead, we must provide more students—including the traditional middle class—with larger awards to continue to attract and retain an academically superior and well-rounded student body. The campaign goal for new financial aid endowment is $4 million.

Viewed in context, we think it is clear that the sentence appellant identifies as a misrepresentation is not, as appellant contends, a guarantee of 100% financial support to any particular student throughout the course of his years at St. Albans School, but rather an aspirational statement of the goal and purpose animating a fundraising effort to ensure that St. Albans School will be able to attract and accommodate students from a broader financial spectrum by meeting their "full demonstrated financial need." Appellees were entitled to summary judgment on

the claim of misrepresentation based on the website statement because (1) there is no evidence that the mission statement for St. Albans School's fundraising campaign is false and (2) no reasonable jury could find that a person in appellant's position who reads this statement of a campaign goal on a website would have reasonably taken it as a guarantee that personal financial circumstances would have no impact on A.B.S.'s ability to continue to attend St. Albans School.

*Use of Computerized Systematic Analysis that Treats Each Family the Same in Making Financial Aid Determinations*

This particular claim of misrepresentation is barely sketched out in the complaint, and does not meet the requirement that each element of fraud be pled, much less with particularity. No facts are alleged to support that the alleged representation was false and, as in the case of the alleged misrepresentation about the chorister stipend and financial aid determinations, there is no specification of who made the alleged representation and under what circumstances.

This deficiency is compounded at the summary judgment stage as there is no evidence, other than appellant's affidavit which merely repeats the allegation made in the complaint. On this bare record, no reasonable jury could find by clear and convincing evidence that appellees made a representation about the manner in which they conducted financial aid reviews (i.e., with the aid of a computerized

systematic analysis of a family's financial situation and treated all families "the same'); that the statement, if made, was false; that it was made with the intent to deceive; and that appellant reasonably relied on the statement to his detriment.

We conclude that because the evidentiary record does not permit a jury verdict in favor of appellant on any of the allegedly fraudulent misrepresentations, appellees were entitled to summary judgment on these claims.  *See Lowry*, 908 A.2d at 36.

4. *Appellees' Counterclaim*

a) *Tuition*

Appellant argues that the trial court erred by granting summary judgment for appellees on their counterclaim for unpaid tuition for the 2009-10 school year because he stated in his affidavit that the Director of Finance at St. Albans School told appellant that the $2,000 payment made on March 17, 2010 satisfied the outstanding tuition debt.

We disagree that appellant's affidavit presents a disputed issue of material fact that precludes summary judgment.  The trial court ruled that appellant's affidavit claiming that he was told the $2,000 payment satisfied his debt of $17,990 could be disregarded under the "sham affidavit" doctrine.  Under that doctrine,

"courts will disregard an offsetting affidavit that is submitted to withstand a motion for summary judgment when the affidavit contradicts prior deposition testimony without adequate explanation and creates only a sham issue of material fact." *Hinch v. Sibley Mem'l Hosp.*, 814 A.2d 926, 929 (D.C. 2003). For the doctrine to apply, "the affidavit must clearly contradict prior sworn testimony, rather than clarify confusing or ambiguous testimony, and the contradiction must lack credible explanation, such as new evidence." *Id.* at 930. Appellant did not assert that Parker assured him that the $2,000 payment satisfied his debt until an August 13, 2011 affidavit, which was filed after appellees filed their motion for summary judgment on their counterclaim for unpaid tuition. The record supports that, at all times before this affidavit, appellant did not regard the $2,000 payment as satisfaction of the entire outstanding tuition. In an earlier affidavit, dated July 28, 2010, signed "under penalty of perjury," appellant demonstrates that he and St. Albans School both understood that there was a remaining balance of unpaid tuition after the $2,000 payment; appellant even provides the terms for payment of that balance in his affidavit. Additionally, appellant's correspondence with the school—both before and after the $2,000 payment was made—indicates that both parties understood that appellant still had an outstanding balance for his son's tuition. Appellant initially was not even aware that the $2,000 payment had been made, and in informing St. Albans School that it could apply the payment to A.B.S.'s tuition, he acknowledged the remaining amount still outstanding. Under

the circumstances, the trial court properly disregarded appellant's contradictory, uncorroborated and convenient affidavit, and granted appellees' counterclaim for unpaid tuition based on the uncontradicted evidence of record.

b) *Attorney's Fees*

Appellant contends that the trial court erred in awarding attorney's fees to appellees, arguing that under the 2009-10 re-enrollment contract appellees were entitled to attorney's fees only as related to their counterclaim for unpaid tuition and not for fees related to defending against appellant's claims. Again, we disagree.

The re-enrollment contract states that, "[i]f legal action is necessary to collect any amounts due," appellant agrees "that the School shall be entitled to recover, in addition to such amounts, reasonable attorney's fees and court costs." We have previously considered such a contractual provision and established that to determine whether a party is entitled to attorney's fees for amounts incurred in defending against claims made by the party opposing collection of the fees, the trial court must consider the necessity for the legal services, taking into account: "(1) whether the party requesting the fees was responsible for precipitating the litigation; (2) whether the litigation for which the party relying on the contract

provision recovers the fees was bona fide and made necessary by the party opposing payment of such fees; (3) whether the claim asserted by the party opposing payment of such fees was raised by way of offset in an attempt to reduce or extinguish the debt owed to the party requesting the fees; and (4) whether it was necessary for the party requesting the fees to defend against the claim of the party opposing the fees in order to collect the underlying debt or enforce the underlying contractual obligation." *Kudon v. f.m.e. Corp.*, 547 A.2d 976, 980 (D.C. 1988) (internal quotation marks and citations omitted). Applying these factors to the circumstances in this case, the trial court determined that appellees could recover attorney's fees incurred in defending against appellant's claims in addition to the fees incurred in prosecuting the counterclaim to collect unpaid tuition. The trial court considered that: (1) appellant was responsible for precipitating the litigation; (2) appellees' counterclaim was bona fide and made necessary by appellant's nonpayment of tuition; (3) appellant's claims, although not raised as an offset to the counterclaim, in effect related directly to the counterclaim for unpaid tuition (i.e., appellant's claims, if successful, would have nullified appellees' counterclaim); (4) it was necessary for appellees to defend against appellant's claims to ensure that collateral estoppel would not bar their counterclaim. As the trial court's determination considered the proper factors and was grounded on the facts and circumstances of this specific litigation, we perceive no abuse of discretion in the trial court's decision to award attorney's fees incurred by

appellees both in connection with their counterclaim for unpaid tuition and in defending against appellant's claims.[19]

## C. Judicial Bias

Appellant's final contention is that the judgment should be set aside because the trial court denied him the right to an impartial tribunal, and that the case should be remanded for trial before a different judge.

We begin by noting that recusal for bias is required whenever a judge has a personal bias or prejudice for or against either party in a case. *See* Super. Ct. Civ. R. 63-I. To require recusal, bias must be "personal in nature and have its source 'beyond the four corners of the courtroom.'" *Anderson v. United States*, 754 A.2d 920, 925 (D.C. 2000) (quoting *Gregory v. United States*, 393 A.2d 132, 142 (D.C. 1978)). Thus, "[o]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute bias for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Mayers v. Mayers*, 908 A.2d 1182, 1194 (D.C. 2006) (quoting *Liteky v. United*

---

[19] Appellant does not contend that the amount of the fee award is unreasonable.

*States*, 510 U.S. 540, 555, (1994)).  Appellant does not claim that there are extrajudicial sources for the alleged bias; rather, he points to several actions and rulings by the trial court in the proceedings as evidence of the trial court's antagonism against him and favoritism toward appellees.

1. *Delay*

In his motion for recusal and on appeal, appellant argues that the trial court intentionally delayed the proceedings for the purpose of causing him prejudice. Specifically, he points to the trial court's delay in ruling on discovery motions, which he claims were not decided until 565 days after the first motion was filed.[20] As a result, appellant argues, resolution of his case was delayed, leading to spoliation of evidence and increased cost of litigation.  Regardless of the period in question, appellant offers no evidence that the trial court delayed his case for an improper purpose; he simply infers that, because the trial court took a significant

---

[20] Appellees dispute the calculation of the delay involved, stating that the ruling was made in less than nine months (December 21, 2010 to September 15, 2011).  In its order denying the recusal motion, the trial court did not take issue with appellant's calculation of the delay, but ruled that the allegation was insufficient because it pertained "exclusively to matters intrinsic to this case" and did not involve "any allegation of prejudice from an extrajudicial source (much less allegations setting forth specific facts regarding time, place, persons, and circumstances of such influences)."  We, therefore, review the trial court's ruling on the basis on which it was made.

amount of time to rule on discovery motions and ultimately stayed discovery to decide several pending motions for summary judgment, the delay was intended to prejudice his case. We see no basis for such an inference. There is nothing out of the ordinary or suspect about the trial court's stay of discovery while considering other motions (including motions for partial summary judgment) that if granted would have an impact on the scope of discovery, or obviate it altogether. With respect to prejudice resulting from the delay, appellant does not state what evidence was lost during this time or how the litigation became more expensive— appellant represented himself at trial as he does on appeal. Appellant's claim that the trial court's delay in ruling evidenced bias and caused him prejudice is unsubstantiated and therefore insufficient to require recusal.

2. *Settlement negotiations*

Appellant argues on appeal that appellees' counsel improperly revealed the following confidential settlement information: (1) a letter from appellant to appellees' counsel, dated April 2, 2010, seeking to settle the re-enrollment dispute, in which appellant said "he had been described by one federal appellate court as a 'leviathan of litigation,'" that appellees referred to and attached to their opposition to appellant's second motion for summary judgment (2) a comment by appellees' counsel, in a motion concerning discovery, that appellant had stated during a

telephone call that he was "not a rational plaintiff," that the case was "about 'payback' and 'revenge' rather than money," and that appellant was "going to pick up whatever rock is available and keep throwing until [he was] out of rocks"; and (3) appellant's letter, dated April 8, 2013, indicating appellees' willingness to discuss settlement, accompanied by appellees' counsel's statement, which appellant alleges is false, that appellant was unwilling to settle. Appellant claims that the trial court relied on and was negatively influenced by this information concerning settlement.

It is well established that a trial court may not "use the information provided in settlement letters for the purpose of determining what is an appropriate resolution of a matter." *Lively v. Flexible Packaging Ass'n*, 930 A.2d 984, 994 (D.C. 2007); *see also* Fed. R. Evid. 408 (a)(2) ( stating that "conduct or statement made during compromise negotiations about the claim" is not admissible "to prove or disprove the validity or amount of a disputed claim"). Appellant has failed to demonstrate, however, that appellees' counsel's "revelations" constituted settlement information, or that they were relied upon by the trial court in its rulings. As an initial matter, appellant provides evidence of the trial court's reference to only one of the three alleged improper disclosures: appellant's letter of April 2, 2010. Although appellant cites two occasions on which the trial court mentioned the April 2, 2010 letter, there is no reason to conclude that the trial court

improperly relied on its content in rendering any of its decisions. Appellant contends that the trial court relied on his letter in deciding to grant summary judgment for appellees on his claim that the discretionary clause in the re-enrollment contract was unconscionable. However, as the trial court's order explained in the footnote that referred to the letter, the grant of summary judgment for appellees was not based on the contract's discretionary clause but on the clause that permitted St. Albans School to refuse A.B.S.'s re-enrollment for appellant's failure to pay tuition. Consequently, the court's reference to the letter in its order was merely an aside about a matter the trial court said it did not need to decide and did not rely upon in granting summary judgment to appellees.[21] Similarly, there is no merit to appellant's argument that the trial court improperly relied on

---

[21] The trial court had earlier ruled, in partially granting appellant's motion to strike appellee's use of the April 2, 2010 letter, that because the letter "invit[ed] negotiation and compromise," it would not be admissible "with respect to issues related to settlement of the then-existing dispute." It added, however, that the letter would be admissible for other purposes, such as to show, "by its intemperate tone . . . that St. Albans had a legitimate basis for concluding that it no longer had a constructive relationship with" appellant. *See Auxier v. Kraisel*, 466 A.2d 416, 419-20 (D.C. 1983) (noting that evidence related to settlement is admissible for issues other than liability). In granting summary judgment to appellees on appellant's claim that St. Albans School could not rely on the contract to deny reenrollment to A.B.S., the trial court simply reiterated its earlier evidentiary ruling, noting in a footnote that the letter could be used to show the need for the discretionary provision in the contract to maintain "a congenial learning environment" in a "relatively small community." As explained in the text of the order, however, that was not the basis for the trial court's grant of summary judgment to appellees because the trial court relied on a separate clause that authorized St. Albans School to deny reenrollment for failure to pay tuition.

appellant's characterization of his litigation prowess (a "leviathan of litigation" who employed "every legal tactic I know") in awarding attorney's fees to appellees. Even if the statement was "made during compromise negotiations about the claim," Fed. R. Evid. 408 (a)(2), it did not go to the substance of the claims disputed in the letter. Moreover, this characterization added little to what was already plainly evident to a trial judge who sat through the long and contested proceedings and, based on personal observations, commented on appellees' need to defend against appellant's eight-count complaint "and the assiduity with which [appellant] pursued his completely non-meritorious case." As a result, the trial court concluded, the fact that litigation costs were four times the amount of the counterclaim amount was a "self-inflicted wound." We perceive no improper reliance on statements made during settlement discussions.

3. *Request for Trial Court's Personal Calendar*

Appellant contends that the trial court demonstrated partiality by refusing his request to disclose the court's personal trial calendar. Appellant argues that he was entitled to review the calendar to determine whether the trial court was treating his case differently than other similar cases over which the judge was presiding. Appellant cites no authority in support of his request for a trial court's calendar, which is not generally available for release to the public. *See Lewis v. U.S. Dep't*

*of Justice*, 867 F. Supp. 2d 1, 13 n.5 (D.D.C. 2011) (noting that the judicial branch calendar is not subject to the Freedom of Information Act). Moreover, appellant had already attempted (and failed) to obtain the trial court's calendar through litigation in federal court. *See Sibley v. Macaluso*, 995 F. Supp.2d 57, 64 (D.D.C. 2013). Under the circumstances, where appellant's litigation to obtain the calendar was rebuffed by the federal court, appellant's argument that the trial court's denial of the same request created an appearance of impropriety has no merit.

4. *Favoritism for Appellees*

Appellant's last contention is that the trial court's rulings for appellees show bias against appellant. Specifically, he argues that the trial court: unevenly applied Superior Court Civil Rule 12-I (a) by permitting appellees to file a motion without complying with the rule's requirement that a certification be included signifying that consent was sought from the opposing party, yet denying appellant's motion to recuse the judge for failing to comply with the same rule; denied appellant's motion to strike and request to depose appellees' counsel after counsel submitted an allegedly tampered affidavit; and "white-wash[ed]" the record and denied appellant's motion to depose appellees' counsel after counsel made what appellant characterizes as a knowing misrepresentation regarding incorrect attorney's fees charges.

We perceive no merit in appellant's argument that these rulings support his claim that the trial court was biased in favor of appellees. The trial court explained the reason for its uneven application of Rule 12-I (a). Noting that it regularly denied motions for failing to comply with the rule's requirement of advance consultation with the opposing party, the trial court said it did not penalize appellees for failing to comply with the rule in filing a motion for summary judgment because appellant had "wasted the court's time with at least one patently frivolous motion, and a balancing of the equities [did] not entitle him to" relief on his motion to strike. In contrast, the trial court denied—albeit without prejudice— appellant's motion to recuse for failure to comply with Rule 12-I (a), because appellant was familiar with the rule and had attempted to invalidate a motion of appellees for noncompliance with its requirements only one month before his own failure to comply with the rule. The trial court's reasoned explanation for the two different rulings defeats appellant's claim that they were motivated by bias. Appellant's claim about the need to depose appellees' counsel for "tampering" with Vance Wilson's affidavit, based on the fact that one of its three pages was faxed while the other two were laser-printed, is unsupported in light of appellees'

counsel's explanation, which appellant has not refuted.[22]  Appellant's third claimed

evidence of bias involves the trial court's denial of his request to depose appellees'

counsel about a minor mistake in the billing records presented with appellees'

request for attorney's fees.[23]  There is simply no evidence that the trial court

"white-wash[ed]" the record or that the disputed entry was anything other than a

billing error rather than an intentional misrepresentation.

## III. Conclusion

We conclude there is no error on the part of the trial court in denying

appellant's motions for partial summary judgment, and in granting summary

judgment to appellees on appellant's claims; nor is there error in the grant of

summary judgment on appellees' counterclaim for unpaid tuition and attorney's

fees.  We also find no abuse of discretion in the trial court's rulings concerning

discovery or the denial of appellant's motion to further amend his Amended

---

[22]  As appellees' counsel explains in the brief on appeal, "[i]nstead of being numbered 'Civ. No. 2202-10,' which was an acceptable style in June 2010 . . . , by August 2010 the case number needed to be stated as 'Case No. 2010 CA 002202 B.'  No other changes to the affidavit were made."  Appellant provides no explanation for why he thinks this technical correction means Wilson's affidavit was improperly altered.

[23]  1.8 hours were inappropriately billed and eventually excluded from the attorney's fee award.

Complaint. Additionally, we conclude appellant has not supported his claim of judicial bias or partiality. Accordingly, the judgment is

*Affirmed.*