# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued December 18, 2024   Decided August 19, 2025

No. 23-7135

JANE DOE, BY AND THROUGH HER NEXT FRIEND, JULIE DOE
AND JULIE DOE, MOTHER AND NEXT FRIEND OF JANE DOE,
APPELLANTS

v.

DISTRICT OF COLUMBIA AND AQUEELHA JAMES,
INDIVIDUALLY AND AS AN AGENT OF DISTRICT OF COLUMBIA,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-02181)

———

*Kasey K. Murray* argued the cause and filed the brief for appellants. *David M. Schloss* entered an appearance.

*Graham E. Phillips*, Deputy Solicitor General, Office of the Attorney General for the District of Columbia, argued the cause for appellees. With him on the brief were *Brian L. Schwalb*, Attorney General, *Caroline S. Van Zile*, Solicitor General, and *Ashwin P. Phatak*, Principal Deputy Solicitor General.

Before: MILLETT, KATSAS, and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PAN.

PAN, *Circuit Judge*:   When appellant Jane Doe was a freshman at a public high school in the District of Columbia, she was sexually assaulted by a classmate in a school bathroom.   Jane's mother, Julie Doe, reported the assault to District officials, and the District investigated.   The District concluded that Jane had likely been assaulted and took remedial measures to assist Jane and to protect her from further harassment.   Jane never encountered her assailant again.

Although the District as a whole worked to respond appropriately to the assault on Jane, evidence suggests that one administrator — Principal Aqueelha James — did not.   Shortly after the Does reported the assault to school administrators and before any investigation had taken place, Principal James told other administrators that she was sick of the Does, that Jane's claim was "bullshit," and that James would take steps to "embarrass [Jane's] ass."   Even after Principal James watched video footage unmistakably corroborating Jane's claim, James lied to her superintendent about what the footage showed.   On other occasions, she downplayed what had happened to Jane and declined to share information that supported Jane's account.

Jane sued the District and Principal James.   She alleged that the District responded to the assault with deliberate indifference and that District officials, including Principal James, retaliated against her, all in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688. Jane also brought claims under D.C. tort law, alleging negligent infliction of emotional distress (NIED) and intentional infliction of emotional distress (IIED).

The district court dismissed the NIED claim for failure to state a claim and, after discovery, granted summary judgment to defendants on the IIED and Title IX claims. For the reasons explained below, we affirm the district court as to the NIED claim and the Title IX claims. But because a reasonable jury could conclude that Principal James intentionally inflicted severe emotional distress on Jane, we reverse the grant of summary judgment as to the IIED claim and remand for further proceedings consistent with this opinion.

## I.

### A.

June 13, 2017, was Jane Doe's penultimate day as a freshman at Roosevelt High School, a public school in the District of Columbia.[1] Her classmate, M.P., chose that day to sexually assault her in a Roosevelt High bathroom. When M.P. refused to return a charger that Jane had lent him, Jane followed him out of a classroom and down a hallway. Hallway security footage shows that as Jane and M.P. neared a bathroom, M.P. grabbed Jane and forcibly dragged her into the bathroom. M.P. then forced Jane into a stall, where he molested and kissed her for several minutes, leaving a mark on her neck. Security footage shows Jane leaving the bathroom visibly distressed. Jane immediately called her mother, Julie Doe, who gave Jane permission to go home. Julie then reported the assault to Superintendent David Pinder, the District of Columbia Public Schools (DCPS) official who oversees Roosevelt High.

---

[1] We draw these facts from the parties' summary-judgment papers and present the evidence in the light most favorable to Jane, the nonmoving party. *See Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016).

The next day, Julie Doe emailed Superintendent Pinder and Aqueelha James, the Principal of Roosevelt High, requesting "assistance" in response to the assault. App. 642. That evening, after the last day of classes had ended, Julie and Jane Doe met Principal James, Assistant Principal Michael Moss, and Intervention Coach Maurice Butler in a conference room at Roosevelt High. Reginald Stevens, the Dean of Students, participated by phone. Unbeknownst to the Roosevelt High administrators, Julie Doe was recording the meeting on her cellphone.

Principal James began by asking Jane about the assault. After a few minutes of brusque questioning, Julie Doe informed Principal James that Jane did not feel comfortable due to James's demeanor and tone, which Julie described as uncaring. Audio Recording 4:48 to 4:53, 5:08 to 5:10, 5:28 to 5:30, 5:58 to 6:26. James told the Does that she took Jane's claim seriously and that she would contact the police to investigate it. Nevertheless, Jane was upset by what she perceived to be James's insensitivity and left the room. Julie Doe quickly followed her daughter but left her phone, still recording, on the conference table.

Immediately after the Does exited the conference room, Julie's phone recorded Principal James telling the other administrators the following:

> This whole thing is going to blow up in [Jane's] face, that is why I am going to go the extra mile and call [the police,] . . . because I am sick of her, sick and tired of her and her mom. So I am going to call [the police] and have a long and drawn out email just so that I can embarrass her ass . . . . You should see the dress she's got

> on. . . . Since I walked into this building, I immediately responded to what I knew was bullshit.

Audio Recording 9:34 to 11:10.

Several minutes later, Jane returned to the conference room, where she was interviewed by Intervention Coach Butler. Police officers then arrived and arranged to interview Jane at her home. While officers talked to Jane, Julie Doe spoke with Principal James at Roosevelt High. James mentioned that Superintendent Pinder was willing to grant Jane a transfer to Cardozo High School, a school that Julie dismissed as "gang-infested." Audio Recording at 53:30 to 54:10. Later that evening, James emailed Julie that her staff would "review the cameras" and provide Jane with counseling options, and that James would "follow-up with Dr. Pinder" regarding a transfer. App. 55–56. But James telephoned Pinder and told him she did not believe that Jane was assaulted.

On or around June 14, Principal James directed Dean Stevens to retrieve the hallway security footage and conduct an investigation. By June 16, DCPS personnel had secured the footage and sent a copy to the police. Then, around June 22, Principal James watched the video. Although that video unmistakably corroborated Jane's account — by showing M.P. dragging Jane into the bathroom against her will — Principal James continued to dispute Jane's claim. According to Superintendent Pinder, James told him that the footage did not support Jane's claim and that instead, "it appeared that the young man and Jane were hand-in-hand and entered the bathroom mutually." App. 639.

On June 26, James appeared to underplay the incident in an email to Jane Spence, a senior DCPS official. James told

Spence only that Intervention Coach Butler "informed me that [Jane Doe] (rising 10th grader), told him that the boy kept trying to hold her down and kiss her." App. 703. Although James simultaneously forwarded to Spence an email from Julie Doe describing how M.P. had pulled Jane Doe into the bathroom, *see* App. 55–56, James did not mention to Spence the security footage that showed M.P. forcibly dragging Jane into the bathroom.

Similarly, on July 17, when asked by another DCPS official, Milo Howard, to provide an update regarding "the outcome of the [police] investigation," App. 687, James directed a subordinate to reply on her behalf; when her subordinate merely informed Howard that prosecutors had declined to bring a case against M.P., James did not mention the existence of security footage that corroborated Jane's claim of assault.

Nevertheless, independent of Principal James's actions, the District conducted a Title IX investigation, which ultimately confirmed Jane's claim that she had been sexually assaulted. At the outset of that investigation on June 27, Lynice Hannah, DCPS's manager of civil rights compliance, emailed Julie Doe that the District took Jane's claim "very seriously!" App. 1031–32. Hannah proactively communicated with the Does throughout the investigation. And in a letter to the Does dated July 17, the District concluded that it was "more likely than not" that Jane had been sexually harassed by M.P. App. 341.

The letter noted several "corrective actions" that the District had already implemented: Among other things, the District had provided Jane counseling services and had given her the opportunity to participate in a paid community-service program over the summer. App. 341. The letter also noted that

Superintendent Pinder had offered Jane two more school-transfer options, in addition to Cardozo, though none of the options were to Julie Doe's satisfaction — she wanted Jane to transfer to Woodrow Wilson High School or School Without Walls. And the letter recommended further counseling for Jane, discipline against M.P., and the creation of a "safety plan" that would ensure "full separation" between Jane and M.P. if Jane chose not to transfer schools. App. 342. The parties dispute whether the Does received a copy of the letter.

Jane and Julie Doe eventually listened to the recording of Principal James telling other administrators that she would "go the extra mile" and "embarrass [Jane's] ass." Both Jane and Julie were distressed by Principal James's remarks, and Julie sent Superintendent Pinder a copy of the audio recording.

In mid-August, Pinder listened to the recording and watched the security footage. Concerned by what he had seen and heard, Pinder filed a disciplinary report against James and requested an investigation into her conduct. Pinder wrote that James's "clear distrust of [Jane] . . . clouded her judgment and endangered student safety." App. 639. Pinder also noted that "James was not transparent with me about the nature" of the assault on Jane. App. 640. Although James "indicated . . . that there was no evidence on the video of an assault," the video "[c]learly" shows that M.P. "pulled Jane in the bathroom against her will." App. 639. The District investigated James, "substantiated" Pinder's report, and issued a formal reprimand against James. App. 644.

After viewing the security footage, Superintendent Pinder also granted the Does' request to transfer Jane to Wilson High. Jane's transfer was finalized the week before the start of the new school year.

Ultimately, the District never disciplined M.P. for assaulting Jane. By the start of the new school year, M.P. had transferred from Roosevelt High to a different public school in the District. Although Pinder notified officials at M.P.'s new school of his misconduct the prior academic year, the District concedes that M.P.'s new school failed to take disciplinary action. Jane, however, never encountered M.P. again.

**B.**

After her transfer, Jane struggled at Wilson High. As a result of the assault and Principal James's response, Jane "had a hard time focusing on schoolwork because [she] felt sad and depressed a lot of the time," and she no longer trusted teachers and administrators. App. 665.

Jane was frequently absent from school. During her sophomore year, Wilson High marked Jane absent 74 times, with 48 of those absences marked as unexcused. Jane disputes 41 of those 48 unexcused absences, and argues that many were for therapy appointments and therefore should have been marked as excused. Jane also complains that administrators at Wilson High were not informed by District officials that Jane had suffered a sexual assault at Roosevelt High.

In September 2018, shortly after Jane's junior year began, the Does filed this lawsuit against the District and Principal James. A week later, *The Washington Post* reported on the lawsuit. After the article was published in the *Post*, Wilson High administrators gleaned that Jane was the sexual-assault victim from Roosevelt High who had sued the District.

At some point in September 2018, Jane was removed from the cheerleading team because of too many unexcused absences from cheerleading practice. The next month, Julie

Doe filed a grievance with DCPS, alleging that Jane was wrongly kicked off the team, incorrectly marked for unexcused absences, and given an unreasonable three days to complete fifty make-up assignments.

After an investigation, the grievance office found that Jane's "attendance has been documented accurately" and that her removal from the cheerleading team was proper due to her many unexcused absences. App. 795. The grievance office provided Jane with extra time for her make-up assignments and twenty-five hours of additional tutoring. The grievance office further stated that it would set up a meeting with Wilson High administrators to help Jane obtain mental-health accommodations. Julie Doe appealed the grievance office's determination and, after "further investigation," App. 799, a senior administrator denied Julie's appeal. The administrator noted that Wilson High officials had met with the Does to develop accommodations for Jane and that Jane's accommodations plan was "currently active." App. 799–800.

By the end of Jane's junior year, the District had marked Jane for 106 total absences, 56 of which were marked as unexcused. Julie Doe filed a second grievance that summer. In September 2019, the grievance office determined that 10 of those 56 unexcused absences should have been marked as excused. As a result, the District amended Jane's U.S. history grade from an F (due to unexcused absences) to a C-.

Over Jane's junior and senior years at Wilson High, after *The Washington Post* reported on Jane's lawsuit, three Wilson High staff members separately made inappropriate comments to Jane. Early in Jane's junior year, a security guard remarked to Jane, "[O]h, you're the girl from Roosevelt that was sexually assaulted." App. 952. Julie Doe reported this remark to the DCPS grievance office, and the District replaced the security

guard. Later in her junior year, a teacher told Jane to stop using the assault as an "excuse." App. 1070. And finally, during Jane's senior year, a different teacher similarly accused Jane of using the assault as an excuse to skip class. Jane has not offered evidence that she brought those latter two comments to the attention of District administrators.

## C.

After Jane sued the District and Principal James, the defendants moved to dismiss the complaint. The district court declined to dismiss the IIED and Title IX claims. The district court did, however, dismiss the NIED claim for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). The district court explained that Jane brought her NIED claim under a "special relationship theory," and under such a theory, Jane needed to allege "that the defendant has a relationship with the plaintiff or has undertaken an obligation to the plaintiff of a nature that necessarily implicates the plaintiff's emotional well-being." App. 901 (citing *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789 (D.C. 2011) (en banc)). The court concluded that Jane's complaint failed to allege either. Under D.C. law, "the relationship between a student and her school is not enough, without more, to impose the predicate duty of care" for an NIED claim. App. 902 (citing *Sibley v. St. Albans Sch.*, 134 A.3d 789 (D.C. 2016)). And Jane's complaint had not alleged any representations by the District to the Does "that investigation would be conducted or that any remedies would be taken." App. 903.

Following discovery, the defendants moved for summary judgment on the three remaining claims: deliberate indifference, retaliation, and IIED. The district court granted summary judgment to defendants on all three claims. *Doe v. District of Columbia*, 694 F. Supp. 3d 20, 25 (D.D.C. 2023).

First, the district court held that no reasonable jury could find that the District responded to the assault with deliberate indifference in violation of Title IX. *Doe*, 694 F. Supp. 3d at 34. The District promptly investigated Jane's claim of assault, confirmed that Jane had likely been assaulted, provided her with counseling services, and granted her request to transfer to Wilson High. *Id.* at 34–36. "To the extent" Jane's deliberate-indifference claim "extend[ed] to school officials at Wilson High," the district court held that Jane "similarly failed" to raise a jury issue. *Id.* at 37. Although Jane alleged that Wilson High officials mismarked some of her absences as unexcused, the District "looked into the matter again and again . . . , and while it found that the bulk of the absences had been documented accurately, it also made changes based on its review." *Id.*

Next, the district court held that Jane's Title IX retaliation claim likewise failed as a matter of law. The district court reasoned that Principal James's recorded comments did not rise to the level of a materially adverse action. *Doe*, 694 F. Supp. 3d at 40. The district court rejected as unsupported Jane's theory that Principal James interfered with the police investigation of the assault (a theory that Jane does not raise on appeal). *Id.* at 41–44. And the court concluded that Jane failed to raise a jury issue as to whether Wilson High officials retaliated against her. *Id.* at 45–46.

Finally, with respect to the IIED claim, the district court granted summary judgment in favor of both the District and Principal James. The analysis focused "on defendant James's conduct only." *Doe*, 694 F. Supp. 3d at 47. The district court concluded that James's recorded comments could not form the basis of an IIED claim because no reasonable jury could conclude that James either intended those comments to inflict

severe emotional distress on Jane or acted in "deliberate disregard" of a high degree of probability that her comments would cause such distress. *Id.* at 47–48. That is because the Does had "left the room" and "there was no way for James to have known that [Jane] would hear the recorded remarks at any point." *Id.* at 47. The district court did not reach the issue of whether the District would be liable for James's conduct under a theory of *respondeat superior*.

Jane timely appealed. The district court had federal-question jurisdiction over the Title IX claims under 28 U.S.C. § 1331, and supplemental jurisdiction over the NIED and IIED claims under 28 U.S.C. § 1367. We have jurisdiction under 28 U.S.C. § 1291.

**II.**

"We review *de novo* both the dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and the grant of summary judgement." *Coleman v. Duke*, 867 F.3d 204, 209 (D.C. Cir. 2017).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). In reviewing a dismissal for failure to state a claim, we "accept all the well-pleaded factual allegations of the complaint as true and draw all reasonable inferences from those allegations in the plaintiff's favor." *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (cleaned up).

Summary judgment is appropriate "only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Johnson v. Perez*,

823 F.3d 701, 705 (D.C. Cir. 2016) (quoting Fed. R. Civ. P. 56(a)). "A dispute about a material fact is 'genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party'" on the factual issue in dispute. *Id.* (cleaned up) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In reviewing a grant of summary judgment, we "view[] the evidence in the light most favorable to the nonmoving party . . . and draw[] all reasonable inferences in [her] favor." *Id.*

## III.

On appeal, Jane Doe presses two claims under Title IX for deliberate indifference and retaliation, and two claims under D.C. tort law for NIED and IIED. For the reasons below, we affirm the district court's dismissal of Jane's NIED claim and its grant of summary judgment to the District on the Title IX claims. But because a reasonable jury could find for Jane on her IIED claim against James, we reverse the grant of summary judgment with respect to that claim.

### A. Deliberate Indifference

Title IX seeks to eliminate sex-based discrimination in education programs that receive federal funds. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998). Subject to exceptions not relevant here, it provides:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]

20 U.S.C. § 1681(a).  Private parties may enforce this provision against federal-funding recipients through an implied cause of action for damages.  *See Gebser*, 524 U.S. at 281.  "Title IX does not provide for individual liability; only a recipient of federal funds may be liable in damages under Title IX."  *Bose v. Bea*, 947 F.3d 983, 988 (6th Cir. 2020) (cleaned up); *see also Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 641 (1999) ("The Government's enforcement power [under Title IX] may only be exercised against the funding recipient . . . , and we have not extended damages liability under Title IX to parties outside the scope of this power."). Accordingly, Jane's Title IX claims are against the District only; she has no Title IX claim against Principal James.

Critically, a funding recipient may be held liable "only for its *own* misconduct." *Davis*, 526 U.S. at 640 (emphasis added). Thus, a recipient school district is not liable for harassment that a teacher commits against a student, or that one student carries out against another.  It may, however, be liable, "in certain limited circumstances," for its own deliberate indifference to known acts of sexual harassment committed by a teacher against a student or by one student against another.  *Id.* at 643; *see also Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 182 (2005) ("[A] recipient's deliberate indifference to one student's sexual harassment of another . . . constitute[s] intentional discrimination on the basis of sex" as prohibited by Title IX.).

That is the claim that Jane brings here:  She contends that the District responded to the sexual assault she suffered with deliberate indifference.  To prevail on a claim of deliberate indifference to sexual harassment, a plaintiff must satisfy five elements.  First, the sexual harassment complained of must be "so severe, pervasive, and objectively offensive . . . that the victim-students are effectively denied equal access to an

institution's resources and opportunities." *Davis*, 526 U.S. at 651. Second, an official with authority to address the harassment must have "actual knowledge" of that harassment. *Id.* at 650; *see also Gebser*, 524 U.S. at 290. Third, the recipient must have "substantial control over both the harasser and the context in which the known harassment occurs." *Davis*, 526 U.S. at 645. Fourth, the recipient's response or failure to respond must amount to "deliberate indifference to known acts of harassment." *Id.* at 643. Fifth, that "deliberate indifference" must "'subject[]' its students to harassment." *Id.* at 644. "That is, the deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *Id.* at 645 (cleaned up).

The district court held that the District's response to the assault did not amount to deliberate indifference as a matter of law. We agree.

Deliberate indifference is a "high standard" that requires more than a showing of mere negligence. *Davis*, 526 U.S. at 642–43. A recipient is "deliberately indifferent to . . . student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id.* at 648 (cleaned up). This standard is meant to provide administrators with "flexibility" and "to account both for the level of disciplinary authority available to the school and for the potential liability arising from certain forms of disciplinary action." *Id.* at 648–49. Thus, recipients need not "purg[e] their schools of actionable peer harassment" nor "engage in particular disciplinary action." *Id.* at 648. Victims, moreover, have no "Title IX right to make particular remedial demands." *Id.* In order to avoid liability, the "recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable." *Id.* at 649.

Here, the District's response was not clearly unreasonable, and no reasonable jury could conclude otherwise. The undisputed evidence shows that District officials took prompt action that was reasonably calculated to prevent further harassment. *See Feminist Majority Found. v. Hurley*, 911 F.3d 674, 689 (4th Cir. 2018) (a recipient's response may amount to deliberate indifference when the recipient, although "not entirely unresponsive," failed to "engage in efforts that were 'reasonably calculated to end the harassment'" (cleaned up) (quoting *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 669 (2d Cir. 2012))). District officials met with the Does within a day of the assault, reported the assault to the police, secured the video footage that corroborated Jane's claim, and began their own Title IX investigation. Within five weeks, the District's Title IX official concluded that Jane had likely been assaulted. The District, moreover, took several remedial actions in response to the assault. It immediately provided Jane with counseling services, offered her several transfer options, and subsequently granted her preferred transfer to Wilson High. Jane never encountered her assailant again nor suffered any further sexual harassment.

Jane complains that it took the District over two months to approve her preferred transfer to Wilson High. In certain circumstances, a delayed response may amount to deliberate indifference. *See, e.g.*, *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1296–97 (11th Cir. 2007); *Zeno*, 702 F.3d at 669–70. But that is far from the case here.

First, context matters. *See Davis*, 526 U.S. at 648. The delay that Jane complains of occurred over the summer, when school was in recess. *See McAvoy v. Dickinson Coll.*, 115 F.4th 220, 229 (3d Cir. 2024) (the fact that a delay was due in part to a college's winter recess mitigated against a finding of

deliberate indifference). The District granted Jane's preferred transfer before the new school year began and thus before Jane might have reencountered her assailant. Accordingly, any delay in granting the transfer to Wilson High did not render the District's response "clearly unreasonable *in light of the known circumstances*." *Davis*, 526 U.S. at 648 (emphasis added).

In any event, a victim is not entitled to receive a particular remedy, *Davis*, 526 U.S. at 648, and the District quickly offered Jane several remedial options before eventually granting her preferred remedy. In particular, Superintendent Pinder promptly offered Jane a transfer option within a day of the assault, and two additional transfer options within a month. District officials also promised to set up a safety plan for Jane in the event that Jane chose to return to Roosevelt High. Although the Does were not satisfied with those remedial options, Jane has made no showing that they were clearly unreasonable. *See Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 175 (1st Cir. 2007) (The deliberate-indifference standard "does not require an educational institution either to assuage a victim's parents or to acquiesce in their demands.").

Jane's other arguments fare no better. First, Jane focuses on Principal James's misconduct and argues that a plaintiff can "establish school district liability by showing that a single school administrator . . . responded to harassment with deliberate indifference." Opening Br. 30. That may be so in some cases, but Jane has not shown that Principal James's misconduct amounted to misconduct by the District because the District's response as a whole was attentive and appropriate, not indifferent. The Supreme Court has explained that liability arises from "an official decision *by the recipient* not to remedy" the harassment. *Gebser*, 524 U.S. at 290 (emphasis added). Thus, we must examine the recipient's response as a whole, not the conduct of individual

administrators in isolation. To be sure, the conduct of an individual administrator is relevant to evaluating the recipient's response in its totality, and could perhaps demonstrate deliberate indifference if the individual administrator's conduct materially defined the funding recipient's response. But here, despite Principal James's misconduct, the District as a whole responded in a manner that was not clearly unreasonable. The District, moreover, investigated and formally reprimanded Principal James for her misconduct, which further demonstrates that the District was not deliberately indifferent in its overall response to the assault.

Next, Jane argues that the District's failure to discipline M.P. renders the District's response clearly unreasonable. We again disagree. Title IX does not require a recipient to undertake particular action in response to student-on-student harassment. *See Davis*, 526 U.S. at 648. Although the District failed to discipline M.P., it took other actions reasonably calculated to address the harassment Jane suffered. *See Hurley*, 911 F.3d at 689. In particular, the District investigated and confirmed Jane's claim of assault, and ultimately granted Jane her preferred transfer to a school where she never encountered her assailant again.

Finally, Jane alleges that after the assault, Wilson High officials mischaracterized her absences as unexcused when those absences should have been marked as excused. But those alleged errors — which were committed by officials at a different school months and years after the assault occurred — are not sufficiently related to the District's duty to address the assault and to take steps to protect Jane from further harassment. They thus are not evidence of deliberate indifference to the assault.

## B. Retaliation

Next, Jane claims that District officials retaliated against her for reporting the assault and initiating this suit. In *Jackson v. Birmingham Board of Education*, the Supreme Court recognized that Title IX's implied cause of action encompasses retaliation claims against funding recipients. 544 U.S. at 173. The Court explained that when a funding recipient retaliates "against a person *because* he complains of sex discrimination," that retaliation "constitutes intentional discrimination on the basis of sex in violation of Title IX." *Id.* at 174 (cleaned up) (emphasis in original).

The Supreme Court, however, has never clarified the elements of a Title IX retaliation claim. "Other circuits approach" such claims by "relying on Title VII jurisprudence." *Du Bois v. Bd. of Regents of the Univ. of Minn.*, 987 F.3d 1199, 1203 (8th Cir. 2021); *see also Hurley*, 911 F.3d at 694. Both the district court and the parties did so here, and we accordingly assume without deciding that the Title VII framework for retaliation applies. Under that familiar framework, a plaintiff must show that she engaged in protected activity, that she suffered a materially adverse action, and that there is a causal connection between the protected activity and the adverse action. *See Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015). Moreover, because a funding recipient may only be held liable for its own misconduct, *see Davis*, 526 U.S. at 640, the adverse action must be "attributable to the defendant educational institution," *Hurley*, 911 F.3d at 694.

Here, Jane alleges two categories of retaliatory conduct: retaliation by Principal James, and retaliation by Wilson High staff. We consider each in turn and conclude that neither presents a jury issue.

### 1. Principal James

First, Jane claims that Principal James retaliated against her by repeatedly attempting to sabotage the District's response to her claim of assault. But Jane cannot hold the District liable for Principal James's alleged retaliatory conduct because no reasonable jury could attribute that conduct to the District. Indeed, Jane's theory is that Principal James misled her fellow administrators about the assault, which shows that James was not acting on the District's behalf. *Cf. Bose*, 947 F.3d at 989–91, 994 (university could not be held liable under Title IX where a professor with a retaliatory motive duped unwitting administrators into carrying out an adverse action).

Under Title IX, only funding recipients may be held liable in damages and "only for [their] own misconduct." *Davis*, 526 U.S. at 640–41; *see also Bose*, 947 F.3d at 988. Thus, Jane cannot seek damages against James for retaliation, nor may she seek damages against the District for James's "independent actions." *Gebser*, 524 U.S. at 291. Instead, Jane must show that James's alleged retaliatory conduct is attributable to the District, *see Hurley*, 911 F.3d at 694, and is not the independent conduct of a "rogue" employee, *Doe v. Univ. of Ky.*, 111 F.4th 705, 721 (6th Cir. 2024).

Here, there is no evidence that Principal James was acting on behalf of the District when she allegedly attempted to undermine its investigation and response. *See Univ. of Ky.*, 111 F.4th at 721 (requiring "evidence that [school officials' retaliatory] actions were taken at the behest of the institution" in order to impute that misconduct to the funding recipient). To the contrary, it is clear that James was acting as a rogue employee. As detailed above, the District as a whole took Jane's claim of sexual assault seriously. Indeed, Jane alleges that James was not acting at the District's behest but rather was

actively working to undermine the District's efforts to address Jane's claim of sexual assault. Moreover, once James's misconduct came to Superintendent Pinder's attention, the District investigated and reprimanded James, further demonstrating that James's misconduct cannot be attributed to the District.[2]

### 2. Wilson High

Second, Jane claims that Wilson High officials retaliated against her by marking certain absences as unexcused when they should have been marked as excused.[3] But no reasonable jury could find for Jane on this claim because she cannot demonstrate a causal connection between her protected activity and the alleged adverse action. To demonstrate a causal connection, a plaintiff must show that "the desire to retaliate was the but-for cause of the . . . action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). But as Jane herself alleges, the mischaracterization of absences began before Wilson High officials became aware of the report of the assault

---

[2] Other circuits have held that a recipient can be liable for the independent retaliatory conduct of employees or others when the recipient knows of the retaliation and responds with deliberate indifference. *See, e.g.*, *Univ. of Ky.*, 111 F.4th at 721–22; *Hurley*, 911 F.3d at 695. But we need not reach that issue because Jane did not raise a deliberate-indifference-to-retaliation theory here.

[3] Jane also contends that Wilson High officials retaliated against her by "fail[ing] to . . . correct [her] academic record once [they] became aware that [she] was a sexual assault victim" and by making inappropriate comments regarding the assault in her presence. Opening Br. 39. But Jane forfeited those arguments by failing to raise them in the district court. *See Apprio, Inc. v. Zaccari*, 104 F.4th 897, 910 (D.C. Cir. 2024) ("Absent exceptional circumstances, a party forfeits an argument by failing to press it in district court." (cleaned up)).

and before she initiated this suit. Accordingly, no reasonable jury could conclude that the mischaracterization was motivated by a desire to retaliate against Jane for her protected activity. We therefore affirm the district court's grant of summary judgment to the District on Jane's Title IX retaliation claim.

## C. Negligent Infliction of Emotional Distress

We also agree with the district court that Jane's complaint failed to state a claim for negligent infliction of emotional distress under D.C. law. *See* Fed. R. Civ. P. 12(b)(6).

Historically, under D.C. law, NIED claims were limited to cases where the defendant put the plaintiff in a "zone of physical danger," *i.e.*, where "the defendant's actions caused the plaintiff to be 'in danger of physical injury'" and "as a result, the plaintiff 'feared for [her] own safety.'" *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 796 (D.C. 2011) (en banc) (quoting *Williams v. Baker*, 572 A.2d 1062, 1066 (D.C. 1990) (en banc)). In *Hedgepeth*, the D.C. Court of Appeals expanded the NIED cause of action to permit recovery in cases involving a special relationship or undertaking between the plaintiff and the defendant. *Id.* at 810. To prevail in such a case, the plaintiff must show that:

> (1) the defendant has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff, of a nature that necessarily implicates the plaintiff's emotional well-being, (2) there is an especially likely risk that the defendant's negligence would cause serious emotional distress to the plaintiff, and (3) negligent actions or omissions of the defendant in breach of that obligation have, in fact, caused serious emotional distress to the plaintiff.

*Id.* at 810–11.

Jane relied on a special-relationship theory of liability. To survive a motion to dismiss under that theory, Jane was required to allege that the defendants had a special relationship with her or had undertaken an obligation to her that necessarily implicated her emotional well-being. *Hedgepeth*, 22 A.3d at 815. Although Jane primarily based her NIED claim on the school-student relationship, D.C. law is clear that the "relationship between a student and [her] school" or between a student and a school official "is not enough, without more," to support an NIED claim. *Sibley*, 134 A.3d at 798.[4]

In the alternative, Jane contends that her complaint adequately alleged an undertaking by the District to investigate her claim of sexual assault. We disagree. Although evidence obtained in discovery indicates that the school undertook an obligation to conduct its own investigation, the complaint alleged no such thing. And in reviewing the district court's grant of a motion to dismiss, we consider the facts alleged at the pleading stage, not the evidence later adduced in discovery. *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *see also Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 871 n.9 (6th Cir. 2020) ("In reviewing the district court's grant of a motion to dismiss, this Court considers the

---

[4]    Jane errs in arguing that the *Sibley* court's dismissal of the NIED claim was based not on the insufficiency of the school-student relationship, but instead on a contract between the parties that limited the school's damages liability. Although the *Sibley* court mentioned the existence of the contractual limit on liability as additional support for its dismissal of the NIED claim, that additional consideration neither negated nor limited *Sibley*'s clear statement that the school-student relationship is insufficient, without more, to support an NIED claim. *See* 134 A.3d at 798.

sufficiency of the facts pleaded by the plaintiff, not the facts later discovered." (cleaned up)). It is the plaintiff's responsibility to ensure that the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (cleaned up).

At most, the complaint asserted that school administrators asked Jane questions regarding the assault, secured the hallway video footage, and then referred Jane's claim to the police. The complaint did not allege any representation or promise by school officials that the school would conduct its own investigation separate from the work of the police.[5] Indeed, the complaint explicitly asserted that school officials "did not further investigate" after turning the matter over to law enforcement. Compl. ¶ 26 (App. 23). Accordingly, the complaint did not allege an undertaking by the school to conduct its own investigation. We therefore affirm the district court's dismissal of the NIED claim.

---

[5] For this reason, Jane's reliance on *Cavalier v. Catholic University of America*, 306 F. Supp. 3d 9 (D.D.C. 2018), is misplaced. In *Cavalier*, a district court in this circuit allowed an NIED claim to proceed against a university where, according to the complaint, the university repeatedly and "affirmatively represent[ed] to [the plaintiff] that a no-contact order was in place between her and [her assailant] and that, should [the plaintiff] report . . . violations of that order, it would take the necessary steps to enforce it." *Id.* at 40. Even if *Cavalier* was correct, it offers Jane no support. That is because unlike the complaint in *Cavalier*, Jane's complaint did not allege that the District affirmatively represented that it would investigate her claim of sexual assault.

### D. Intentional Infliction of Emotional Distress

The district court erred, however, in granting summary judgment in favor of Principal James on Jane's IIED claim. To prevail on such a claim, "a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) either intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Larijani v. Georgetown Univ.*, 791 A.2d 41, 44 (D.C. 2002). The district court concluded that James lacked the requisite intent or recklessness as a matter of law. In our view, however, a reasonable jury could find for Jane on all three elements.

### 1. Extreme and Outrageous Conduct

A reasonable jury could conclude that Principal James's conduct was extreme and outrageous. To be sure, "[t]he requirement of outrageousness is not an easy one to meet." *Drejza v. Vaccaro*, 650 A.2d 1308, 1312 (D.C. 1994). "The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Larijani*, 791 A.2d at 44 (cleaned up).

Two principles of D.C. law "profoundly affect the outrageousness calculus" in this case. *Drejza*, 650 A.2d at 1312. First, when alleged conduct involves "a series of actions" that, "taken individually, might not be sufficiently extreme to warrant liability," the finder of fact must consider whether the "actions as a whole" nevertheless constitute extreme and outrageous conduct. *King v. Kidd*, 640 A.2d 656, 674 (D.C. 1993). Second, the finder of fact must consider "the specific context in which the conduct took place," including "the relationship between the parties, and the particular environment" where the conduct occurred. *Id.* at 668. Conduct

that might otherwise not be extreme and outrageous may become so if the defendant abused a position of power over the plaintiff or if the defendant was aware of the plaintiff's peculiar susceptibility to emotional distress. *Id.*

Examining Principal James's actions as a whole and drawing all reasonable inferences in Jane's favor, a reasonable jury could make the following findings and conclude that James's conduct was extreme and outrageous: James was a high school principal confronted with a serious allegation that a student had been sexually assaulted at James's school. Yet James, before any investigation had been conducted and without any evidence, stated to other school administrators that Jane's allegations were "bullshit." She also stated her intent to "embarrass [Jane's] ass" and said, "you should see the dress [Jane's] got on." James made those comments to subordinates who she knew would be tasked with investigating Jane's claim. Moreover, she treated Jane brusquely and disrespectfully in their first meeting after the assault, causing Jane to become emotional and leave the room.

In evaluating whether James's conduct was extreme and outrageous, a jury also could consider James's conduct following the June 14 meeting and reasonably infer that James's conduct was consistent with her stated desire to embarrass Jane. Even after James saw video evidence that unmistakably corroborated Jane's claim, James continued to discredit Jane and to undermine the District's investigation. She lied to Superintendent Pinder about what the videotape depicted, falsely stating that the security footage showed Jane consensually entering the bathroom with M.P. Moreover, a reasonable jury could find that, in her interactions with other District officials in positions to help Jane, James withheld pertinent information regarding the assault, including when, on separate occasions, Jane Spence and Milo Howard requested

updates on the matter. Superintendent Pinder ordered an investigation into James's efforts to undermine the investigation because, in his view, her conduct "endangered student safety." App. 639. As a result of the investigation, James was disciplined for her conduct.

James's conduct could be viewed as especially outrageous because James was a school principal who was responsible for Jane's safety. And Jane, as a student who had just been the victim of a sexual assault at her school, was in an "extraordinarily vulnerable condition." *Drejza*, 650 A.2d at 1312. Those circumstances could "profoundly affect the outrageousness calculus." *Id.* Under D.C. law, "acts which are not generally considered outrageous may become so when the actor knows that the other person is peculiarly susceptible to emotional distress," or when the actor holds a position of power and "abuse[s] the authority of [her] office." *Id.* at 1313–14 (cleaned up). Both considerations are relevant here. *See id.* at 1312–13. In short, a reasonable jury, examining Principal James's conduct as a whole and in context, could well conclude that it rises to the level of extreme and outrageous conduct.

Principal James's arguments to the contrary are not persuasive. First, James analyzes each of her actions in isolation and fails to acknowledge that under D.C. law, her conduct must be considered "as a whole and in context." *King*, 640 A.2d at 674.

Second, according to James, Jane's principal authority, *Drejza*, is not on point because in that case, a police detective mocked a rape victim to her face, whereas James made her most inappropriate comments out of Jane's earshot. But James seeks to downplay the extent of her own misconduct. In addition to making inappropriate comments at the June 14 meeting that attempted to influence other investigating

administrators to disbelieve Jane before any facts had been determined, James lied to the superintendent about the content of the videotape, and actively sought to undermine Jane's claim of sexual assault to officials who were in positions to help Jane.

Finally, James's reliance on *Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624 (D.C. 1997), is misplaced. In *Kerrigan*, the D.C. Court of Appeals concluded that the plaintiff had not alleged sufficiently extreme and outrageous conduct where the defendant "targeted him for a sexual harassment investigation, manufactured evidence against him . . . , leaked information from the investigation to other employees, and unjustifiably demoted him to the position of store manager." *Id.* at 628. But *Kerrigan* arose in the employment context, where the D.C. Court of Appeals has been especially "demanding in the proof required to support" an IIED claim. *Id.* Jane's IIED claim arises in a much different context: A high school principal allegedly abused her power to undermine the sexual-assault claim of a young student despite clear evidence corroborating the student's claim of assault. Accordingly, we find James's arguments unpersuasive.

## 2. Intent or Recklessness

A reasonable jury could also conclude that Principal James intended to cause Jane severe emotional distress, or at least acted recklessly in causing that result. Under D.C. law, "specific intent is not required; reckless infliction of emotional distress is sufficient." *Homan v. Goyal*, 711 A.2d 812, 820 (D.C. 1998) (cleaned up). Thus, a defendant may be liable not only when she intends to cause emotional distress, but also when she consciously disregards a high degree of probability that her conduct will cause such distress. *Id.*

The district court granted summary judgment to James on this element. Focusing almost exclusively on James's recorded remarks during the June 14 meeting, the district court concluded that although those "remarks were completely inappropriate," no reasonable jury could find that James made them with the requisite intent or recklessness. *Doe*, 694 F. Supp. 3d at 47. That is because the Does "had left the room" and "there was no way for James to have known that [Jane] would hear the recorded remarks at any point." *Id.*

But James's assumption about what a reasonable jury might conclude is not necessarily correct. James made disparaging statements about Jane's claim to three other administrators. James could not have reasonably expected her conduct — including those remarks — to never come to light. In addition, the record does not foreclose a reasonable jury from finding that James consciously disregarded a high degree of probability that the Does might overhear her remarks from the hallway outside the room. In fact, Julie Doe testified at her deposition that although the sounds in the room were "muffled," she could still "hear" them. App. 473.

In any event, Jane does not rely solely on James's recorded statements. She also contends that Principal James intended to cause her distress by deliberately undermining the District's response to her claim of sexual assault in order to embarrass her. We think a reasonable jury could find for Jane on this theory.

To start, Principal James's own words provide direct evidence of her intent to cause Jane distress, or at least her recklessness in causing that result. James told her subordinates that she wanted to "embarrass [Jane's] ass." A reasonable jury could infer from James's professed intent to humiliate Jane that James intended to cause her severe emotional distress — or at

least consciously disregarded the substantial risk that James's conduct would have that effect.

And indeed, James's conduct was consistent with her stated desire to embarrass Jane: James treated Jane dismissively; biased investigators who were her subordinates against Jane by telling them that Jane's claim was "bullshit"; and subsequently sought to impede the District's response, including by lying to Superintendent Pinder about video evidence that corroborated Jane's claim. In the alternative, a jury could conclude that James consciously disregarded the substantial risk that her actions would cause Jane severe emotional distress by undermining the investigation and making Jane feel that her claim was not being taken seriously by adults responsible for her safety.

### 3. Severe Emotional Distress.

Finally, Jane has raised a jury issue as to whether Principal James's conduct in fact caused her severe emotional distress. Although D.C. law requires "emotional distress of so acute a nature that harmful physical consequences might be not unlikely to result," *Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 164 (D.C. 2013) (cleaned up), the plaintiff need not experience any physical harm, *Homan*, 711 A.2d at 821. D.C. law, moreover, does not require the defendant's conduct to be the sole cause of the plaintiff's severe emotional distress. Rather, the defendant's conduct need only be "a substantial factor in bringing about the harm." Restatement (Second) of Torts § 9 cmt. b; *see also Pitt v. District of Columbia*, 491 F.3d 494, 507 (D.C. Cir. 2007) ("The District of Columbia has adopted the standard for intentional infliction of emotional distress from the Restatement (Second) of Torts.").

Here, a reasonable jury could find that Principal James caused Jane severe emotional distress. To start, Jane was diagnosed with chronic PTSD and severe major depressive disorder. Although Jane's distress was no doubt caused in part by the assault she suffered, there is sufficient evidence for a jury to conclude that James's conduct was also "a substantial factor in bringing about" Jane's distress. Restatement (Second) of Torts § 9 cmt. b. Jane's expert, a clinical psychiatrist, gave deposition testimony that James's conduct "exacerbated" "the trauma of [the] sexual assault" and that Jane's "PTSD symptomatology would not be as severe without the interactions with Ms. James." App. 847–49, 852.

Principal James attempts to resist this straightforward conclusion. She contends that her alleged efforts to undermine the investigation did not cause Jane meaningful psychological harm, largely because those efforts were unsuccessful; and that such conduct was "distinct from the harm caused" by Jane "hearing James's recorded comments," for which James claims she should not be liable because she did not intend for Jane to hear those statements. Response Br. 50. In effect, James asks us to hold that even if her extreme and outrageous conduct caused Jane severe emotional distress and even if James intended to cause such distress, she is still not liable because she did not intend to cause Jane distress *in the particular manner* in which her conduct in fact caused that distress.

This argument is forfeited as James raises it in only "a cursory fashion, without" any citations "to relevant case law or other authority." *Indep. Producers Grp. v. Librarian of Cong.*, 792 F.3d 132, 141 (D.C. Cir. 2015). But even if it were properly before us, we would decline James's invitation to split hairs. When a defendant intends for her extreme and outrageous conduct to cause severe emotional distress, and when the defendant's conduct in fact causes such distress, the

defendant cannot escape liability merely because the defendant hoped to have caused the intended emotional distress in a different way. Indeed, James offers no authority for her contrary contention that there must be a tight fit between the way she intended to cause distress and the way distress was actually caused. Such a rule would be difficult to square with well-established principles of transferred intent. In the assault-and-battery context, for example, a defendant who intends her conduct to put the plaintiff in fear of physical harm is liable when her conduct instead causes actual physical harm, and vice versa. *See* Restatement (Second) of Torts §§ 16, 20. Transferred-intent principles capture the common-sense intuition that a defendant who commits culpable conduct with culpable intent should not avoid liability merely because her conduct causes injury in a way not *precisely* intended. *Cf. Gordon v. United States*, 285 A.3d 199, 210 (D.C. 2022) ("The obvious purpose behind [the transferred-intent] doctrine is to prevent a defendant from escaping liability for a murder in which every element has been committed, but there is an unintended victim." (cleaned up)). We think that the principles underlying the doctrine of transferred intent are instructive here.

To be sure, there are important limits on the applicability of transferred-intent doctrine in the IIED context. D.C. law restricts when a third party who is not the intended target of extreme and outrageous conduct can recover for IIED. *See Owens v. Republic of Sudan*, 864 F.3d 751, 810–11 (D.C. Cir. 2017), *vacated on other grounds sub nom.*, *Opati v. Republic of Sudan*, 590 U.S. 418 (2020). But that limit offers no help to Principal James because Jane was the person James intended to harm.

In sum, a reasonable jury could find for Jane on all three elements of her IIED claim against Principal James. We

therefore reverse the district court's grant of summary judgment on that claim.[6]

* * *

The district court properly dismissed Jane's NIED claim and correctly granted summary judgment to the District on the Title IX claims. The district court erred, however, in granting summary judgment to Principal James on the IIED claim. We therefore affirm in part and reverse in part, and remand to the district court for further proceedings consistent with this opinion.

*So ordered.*

---

[6]    Because the district court did not reach the issue of *respondeat superior* liability for the IIED claim, we leave it to the district court to address on remand whether the District can be held liable for James's conduct.